[No. F026156. Fifth Dist. June 29, 1998.]

JOHN SILVA, Plaintiff and Appellant, v.
LUCKY STORES, INC., et al., Defendants and Respondents.

**COUNSEL**

Frank Ursini, Green & Azevedo and Jerry N. Budin for Plaintiff and Appellant.

Rogers, Joseph, O'Donnell & Quinn, Renée D. Wasserman and E. Sean McLoughlin for Defendants and Respondents.

**OPINION**

**THAXTER, J.**—John Silva (Silva) appeals from the judgment entered after the court granted summary judgment for his former employers, Lucky

Stores, Inc. and American Stores Company (jointly, Lucky), on his wrongful termination action. The novel issue presented is whether Silva raised a triable issue of fact regarding Lucky's decision to terminate his employment under the new standard set forth in *Cotran* v. *Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93 [69 Cal.Rptr.2d 900, 948 P.2d 412]. We will conclude he did not, and we will affirm the judgment.

## PROCEDURAL HISTORY

Silva began working for Lucky in November 1966 as an entry level clerk. In 1974, after intervening promotions, Silva was made a store manager. He continued to work as a store manager until October 7, 1994, when two female employees reported that he had sexually harassed them. After a month-long investigation, Lucky's review board concluded that Silva had violated the store's sexual harassment policy and procedures and terminated his employment.

Silva sued Lucky for breach of an implied contract not to terminate except for good cause and breach of the implied covenant of good faith and fair dealing. Lucky moved for summary judgment/summary adjudication on the grounds: (1) Silva's breach of contract cause of action was without merit because he was an at-will employee and Lucky had good cause to discharge him as a matter of law, and (2) Silva's breach of the implied covenant cause of action was without merit because his termination was based on Lucky's good faith belief that he violated the company's sexual harassment policy. Silva conceded that Lucky was entitled to summary adjudication on his cause of action for breach of the implied covenant of good faith and fair dealing. However, he argued, first, there were triable issues of fact as to whether he was at-will or subject to an implied contract not to be terminated except for good cause. Second, Lucky's good faith belief that he engaged in misconduct was not a defense to his breach of contract claim. Rather, the issue was whether he had actually engaged in the misconduct for which he was terminated. (*Wilkerson* v. *Wells Fargo Bank* (1989) 212 Cal.App.3d 1217 [261 Cal.Rptr. 185].) Because he denied engaging in the alleged harassment, there were triable issues of fact regarding the breach of contract claim.

The trial court found no triable issues of fact. First, Silva failed to introduce admissible evidence to rebut the Labor Code section 2922 presumption and raise a triable issue of material fact that his employment by Lucky was other than at will. Second, Silva failed to introduce admissible evidence sufficient to raise a triable issue of material fact that Lucky's decision to terminate his employment based on violation of the company's

sexual harassment policy was not within the legitimate scope of its managerial discretion. The court entered judgment for Lucky. Silva appealed that decision.

## FACTS

On October 7, 1994, about 4:30 or 5:00 p.m., courtesy clerk Leticia Barajas was taking an unscheduled restroom break from her job of bagging groceries at Lucky's. As she ran through the double doors into the back room, Silva was standing near the entrance to the hallway that led to the restrooms. Ms. Barajas told Silva to move. Instead of moving, Silva crouched down and grabbed her buttocks. After Silva left the store, Ms. Barajas spoke with the head clerk, Randy Wilson, who paged Lucky's human resources representative, Jeff Szczesny, to investigate the incident.

Szczesny came to the store and interviewed Ms. Barajas at 6:30 p.m. Ms. Barajas described the incident to Szczesny. When asked if she had heard any other women complain, Ms. Barajas said that checker Rochelle Saldana had told her that Silva "slapped her on the butt." Szczesny interviewed Ms. Saldana later that night. Saldana told him that several weeks earlier, Silva had slapped her buttocks while she was bending into a melon bin. When Ms. Saldana told Silva she could charge him with sexual harassment, Silva smiled, removed his name badge and said, "I'm not on the clock."

Szczesny interviewed Silva about the allegations the next morning. Silva admitted that he had crouched down as if he was going to tackle Ms. Barajas as she ran to the restroom. However, he said she bumped into him. He did not remember where his hands were but he denied touching her "butt." Silva told Szczesny he had "smacked" Ms. Saldana on the back or side of her leg six to eight weeks earlier. She was reaching into the watermelon bin and Silva thought she would fall in and hurt herself.

Szczesny interviewed Lucky employees regarding the allegations of sexual harassment. Witnesses to the Barajas and Saldana incidents corroborated that the physical contact had occurred. After the interviews, Szczesny spoke with Silva a third time to elicit his comments and explanations regarding the events reported.

At the completion of his investigation, Szczesny concluded in a written report that it was reasonable to assume that both the Barajas and Saldana incidents took place. The events were corroborated by witnesses and Silva conceded he had physical contact with both women although he asserted it was not of a sexual nature. Szczesny acknowledged that some employees felt Ms. Saldana and Ms. Barajas had ulterior motives.

Based on Szczesny's investigation, Lucky Stores' review board concluded that Silva had violated Lucky's sexual harassment policy and procedures. He improperly touched female employees in the workplace, made inappropriate comments of a sexual or offensive nature, intimidated subordinate employees, and demonstrated a willful disregard for company policy regarding sexual harassment. These actions violated company policies as well as Silva's job responsibilities. Silva was terminated on November 10, 1994, for violation of company policy and procedure.

## DISCUSSION

*Standard of Review*

Summary judgment is properly granted when the papers show there is no triable issue as to any material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)[1] When the defendant is the moving party, he must show either that (1) one or more elements of a cause of action cannot be established, or (2) there is a complete defense. (§ 437c, subd. (o)(2).) Once that burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (*Ibid.*) ▮ We review the trial court's decision to grant defendant summary judgment de novo. We review the ruling, not the rationale. (*Ojavan Investors, Inc.* v. *California Coastal Com.* (1997) 54 Cal.App.4th 373, 385 [62 Cal.Rptr.2d 803].)

In independently reviewing a motion for summary judgment, we apply the same three-step analysis used by the superior court. We identify the issues framed by the pleadings, determine whether the moving party has negated the opponent's claims, and determine whether the opposition has demonstrated the existence of a triable, material factual issue. (*Ojavan Investors, Inc.* v. *California Coastal Com., supra*, 54 Cal.App.4th at p. 385.) Because of the drastic nature of the summary judgment procedure and the importance of safeguarding the adverse party's right to a trial, the moving party must make a strong showing. His affidavits are strictly construed and the opposing party's are liberally construed. (*Kulesa* v. *Castleberry* (1996) 47 Cal.App.4th 103, 112 [54 Cal.Rptr.2d 669].)

1.   *There are no triable issues of fact as to whether Lucky, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing Silva had engaged in the alleged misconduct.*

▮   After the parties had briefed the case on appeal, the Supreme Court decided *Cotran* v. *Rollins Hudig Hall Internat., Inc., supra*, 17 Cal.4th 93.

---

[1]Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

*Cotran* disapproved *Wilkerson* v. *Wells Fargo Bank, supra,* 212 Cal.App.3d 1217 and held that if an implied contract exists, employers who fire employees for misconduct are not required to prove that the alleged misconduct actually occurred. Rather, the employer must show that it reasonably believed that the alleged misconduct took place and otherwise acted fairly. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* at pp. 107-109.)

Cotran sued his former employer after he was fired for sexual harassment of two women. The termination followed a lengthy investigation by the human resources director, who interviewed 21 people, including 5 identified by Cotran. There was no definitive evidence of the alleged misconduct, and the resolution of the allegations depended on credibility determinations by the company's investigators. Senior management involved in the investigation ultimately concluded that Cotran likely had engaged in the harassment and terminated him. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at pp. 96-98.)

At trial Cotran testified that his sexual relationships with the two women were consensual and his accusers had ulterior motives. He had not refuted the allegations when his employer had initially confronted him with them because he was upset, frightened and felt ambushed. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 98.) The employer's defense was that it had conducted a fair investigation and had reached its determination honestly and in good faith. (*Id.* at p. 99.) The trial court rejected that theory and ruled the employer had to prove that Cotran committed the acts that led to his dismissal. The court instructed the jury accordingly. The jury returned a substantial verdict for Cotran. (*Ibid.*)

The Supreme Court held that it was not the jury's function to decide whether the acts that led to the decision to terminate actually occurred. Rather, the jury was to assess the objective reasonableness of the employer's factual determination of misconduct. To this end, the jury had to determine whether the factual basis on which the employer concluded a dischargeable act had been committed was reached honestly, after an appropriate investigation and for reasons that were not arbitrary or pretextual. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 107.) "[P]ermitting juries to reexamine the factual basis for the decision to terminate for misconduct—typically gathered under the exigencies of the workaday world and without benefit of the slow-moving machinery of a contested trial—dampens an employer's willingness to act, intruding on the 'wide latitude' [necessary] for the efficient conduct of business." (*Id.* at pp. 105-106.)

The court concluded the jury, on retrial, should be instructed: "[T]he question critical to defendants' liability is not whether plaintiff in fact

sexually harassed other employees, but whether at the time the decision to terminate his employment was made, defendants, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing plaintiff had done so." (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 109.)

██ We asked the parties to address the impact of *Cotran* on Silva's appeal. Lucky responded that *Cotran* was dispositive and compelled this court to affirm the judgment. According to Lucky, Silva conceded that Lucky acted in good faith in terminating him for the alleged sexual harassment, and he did not challenge the appropriateness of Lucky's investigation or the reasonableness of its decision based on that investigation.

Silva responded with alternative arguments. First, since *Cotran* announced a new rule for determining whether an employer has good cause to terminate an employee for misconduct, neither party directly addressed the new standard in the proceedings in the trial court. Thus, he urges this court to reverse the judgment and remand the matter to the trial court for further proceedings consistent with the *Cotran* standard. In the alternative, he argues, the record (although not fully developed) demonstrates triable issues of fact under the *Cotran* test for determining good cause which compel reversal of the judgment.

*The Matter Need Not Be Remanded*

Silva submits he approached the issue of good cause by arguing that *Wilkerson v. Wells Fargo Bank, supra,* 212 Cal.App.3d 1217 applied and there were triable issues as to whether he engaged in the charged misconduct. Lucky approached the issue by arguing that *Wilkerson* did not apply and the proper test was whether Lucky had a good faith *subjective* belief that the misconduct occurred. Because neither party foresaw *Cotran*'s objective standard, Silva did not present all the evidence available to him relevant to the new standard. For example, he did not include all of Szczesny's deposition testimony or all of his investigative reports. He also did not present any expert witness testimony addressing the objective reasonableness of Lucky's factual determination of misconduct or whether Lucky conducted an appropriate investigation under the circumstances.

The case need not be remanded. First, although Lucky focused on the subjective reasonableness of its good faith determination, it included ample evidence going to the objective reasonableness of that belief. Second, if the omitted portion of Szczesny's deposition or investigative report indicated that Lucky's belief that it had good cause to terminate Silva was objectively

unreasonable, it is unlikely that Silva would have failed to use that evidence to dispute Lucky's claim of subjective good faith. Third, judicial efficiency would be thwarted if the case is remanded without any offer of proof by Silva as to additional evidence on the appropriateness of the investigation or the reasonableness of the termination decision.

*There are No Triable Issues of Fact Under the Cotran Standard*

*Cotran* set forth a new standard for good cause in termination decisions. Three factual determinations are relevant to the question of employer liability: (1) did the employer act with good faith in making the decision to terminate; (2) did the decision follow an investigation that was appropriate under the circumstances; and (3) did the employer have reasonable grounds for believing the employee had engaged in the misconduct. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 109.)

All of the elements of the *Cotran* standard are triable to the jury. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 108.) However, if the facts are undisputed or admit of only one conclusion, then summary judgment may be entered on issues that otherwise would have been submitted to the jury. (*Davis* v. *Consolidated Freightways* (1994) 29 Cal.App.4th 354, 366 [34 Cal.Rptr.2d 438].)

(a) *Employer Good Faith*

Silva does not claim that Lucky had a wrongful motive in determining there was good cause to terminate his employment. Moreover, he conceded in the trial court that Lucky did not breach the implied covenant of good faith and fair dealing because it determined honestly and in good faith that good cause existed for his discharge. Silva's concession constitutes an admission that there is no triable issue regarding Lucky's good faith under the first element of the *Cotran* standard.

(b) *Appropriate Investigation*

*Cotran* did not delineate the earmarks of an appropriate investigation but noted that investigative fairness contemplates listening to both sides and providing employees a fair opportunity to present their position and to correct or contradict relevant statements prejudicial to their case, without the procedural formalities of a trial. (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 108.)

While neither party in this case directly addressed the appropriateness of Lucky's investigation in the trial court, Lucky presented substantial evidence

relevant to the issue to support its assertion of good faith. Lucky had a written policy specifying how sexual harassment allegations were to be investigated. The policy directed: Treat complaints seriously, investigate immediately, treat the matter confidentially, conduct interviews in a private area, listen to the allegations and make complete notes, attempt to identify all persons involved as well as possible witnesses, and interview the accused employee.

In addition to its written investigation policy, Lucky designated a particular employee to investigate such claims. Lucky's human resources representative, Jeff Szczesny, was responsible for investigating employee complaints of sexual harassment. It was his practice to interview the employee making the allegation, the employee against whom the allegation was made and any employees who may have witnessed the alleged conduct as soon as possible after the reported occurrence.

Between October 7 and November 7, 1994, Szczesny interviewed 15 Lucky store employees regarding the allegations against Silva. He recorded the information obtained from each witness on a witness interview form and/or obtained a written statement from each pursuant to his usual practice. The witness interview forms and written statements demonstrate the appropriateness of Lucky's investigation in this case.

Silva objected to the reports on hearsay grounds. The objection is without merit. ■ Where the reasonableness of a person's conduct is at issue, statements of others on which he acted are admissible. (*Central H. Imp. Co. v. Memorial Parks* (1940) 40 Cal.App.2d 591, 609 [105 P.2d 596]; 1 Witkin, Cal. Evidence (3d ed. 1986) The Hearsay Rule, § 600, p. 572.) ■ Thus, materials generated during the employer's investigation of misconduct under *Cotran* are admissible to establish that the investigation took place, that it was appropriate under the circumstances and that the termination decision was reasonable based on that information.

Szczesny's reports show that he interviewed Ms. Barajas at 6:30 p.m. the evening of the incident. Szczesny asked her what had happened. She told him she was running to the restroom and Silva, who was talking to Troy Boulter in the back room, was in her way. She told him to move, she had to use the restroom. Instead of moving, he put both of his hands around her and "grabbed her butt." Ms. Barajas said she was "shocked" by the incident. After Silva left the store, she asked Boulter if he had seen what had happened, and he said that he did. Boulter also said that he told Silva he could get in trouble for doing that, and Silva had replied, "What are they going to do about it?"

In response to Szczesny's question had Silva ever touched her before, Ms. Barajas stated that Silva squeezed her cheeks and said, "Let me look at you" and "If I were younger, I would chase you all over town." When asked if she had heard any other women complain, Ms. Barajas told him of Ms. Saldana's complaints.

Szczesny interviewed Troy Boulter regarding the incident that evening after he spoke to Ms. Barajas. Boulter said he was talking with Silva in the back room when Ms. Barajas walked toward them headed toward the restroom. Silva lunged forward as if he was going to tackle her. He put his arms around her and grabbed her "butt" with both hands. Boulter told Silva he was going to get in trouble and Silva replied, "What can they do?" and "snickered." About 10 minutes later, a "very upset" Ms. Barajas asked him, "Am I imagining, or did he really do this," or did Silva do that "on purpose."

Boulter had not heard any other women complain about Silva. However, he remembered that several years ago he had seen Silva pick up a female employee and "bit[e] her on the butt." The woman was laughing and not offended. Boulter had heard Silva make "flirtatious comments," but did not know if anybody was offended by the statements.

That evening, Szczesny had head clerk Randy Wilson prepare a written statement regarding what Ms. Barajas had told him that prompted Wilson to call Szczesny. Wilson's statement corroborates Ms. Barajas's statement to Szczesny.

Szczesny interviewed Rochelle Saldana at 8:30 p.m. the evening of the Barajas incident. Ms. Saldana told him that Silva had "slapped her on the butt four or five times" beginning about six months or a year earlier. She did not tell him to stop or report him because she feared retaliation. However, she had told four other employees about the incidents. The most recent slap occurred about a month earlier. She was in the back room bending into a melon bin to get a melon. Employee Brenda Taylor was present. Silva slapped her; Ms. Saldana retorted, "I could get you for sexual harassment." Silva smiled, removed his name badge and said, "I'm not on the clock." Ms. Saldana said Silva also made suggestive comments to her like, "Don't you look good today," "I need to find a good Mexican girl like you," "Let's go run away," and "If I was 20 years younger I would go for you."

The next morning, Szczesny met with Silva in the store office and asked him about the allegations. Silva said that Ms. Barajas had run into the back room toward the restrooms. He was in a good mood because he was going to a football game that night. He bent down like he was going to tackle her. She

bumped into him and "that was the end of it." He recalled her saying she had to go to the restroom. She ran into his shoulder; he did not remember where his hands were. He denied touching her "butt." He may have grabbed her shoulders to keep her from falling but he did not think she was losing her balance. He did not recall Boulter saying he could get into trouble or him saying, "What are they going to do about it?" Silva said he and Ms. Barajas "joke around a lot" and Ms. Barajas did not seem upset to him that day. Silva stated he would never do something "like that. He would not go that far."

Silva told Szczesny he did not recall touching or slapping any employee on the rear end. He agreed something like that would be inappropriate. He denied saying that if he was younger he would date an employee. Silva believed that Ms. Barajas and Boulter were honest. He commented that Ms. Barajas and Ms. Saldana were good friends and that Ms. Saldana had been "stirring it up" after he talked to her about dress code violations and two customer complaints.

The next day, October 9, 1994, Silva paged Szczesny and wanted to talk again. Silva had talked with an attorney-friend who suggested he get a few things out in the open. Silva told Szczesny he had "smacked" Ms. Saldana on the back or side of her leg six to eight weeks earlier. She was reaching into a watermelon bin and Silva thought she would fall in and hurt herself. In addition, about three weeks earlier Ms. Saldana called him a sexist pig for instructing a male employee to help a female employee with a task. Ms. Saldana had asked him if he wanted to go out with her and he jokingly said maybe he would.

Silva reported that a week earlier, Ms. Saldana and Ms. Barajas were talking when courtesy clerk Mike was called to mop the produce section. Mike suggested that Ms. Barajas get to work and Ms. Saldana told him not to worry about it. Kelly Flowers saw Silva talk to Ms. Saldana about the incident. After Ms. Saldana left, Flowers warned Silva, "You need to be careful, she will tag you someday."

Silva also reported that Ms. Barajas pinched his cheeks and asked if he was having a good day. He admitted telling her, in front of her boyfriend, that if he was younger he would treat her right and spoil her. Ms. Barajas later told him that was nice of him to say so. He said he did not know she was offended; she had never complained. He thought she should have stopped before running into him in the back room.

Szczesny interviewed journey clerk Brenda Taylor on October 8, 1994. Taylor enjoyed working at the store and got along well with the other

employees. She had never given the sexual harassment policy any attention. When asked if she had witnessed sexual harassment at the store, Taylor said, about a month earlier, she had been in the back room while Ms. Saldana bent over the watermelon bin. She heard "a very loud slap" followed by Ms. Saldana telling Silva she could file harassment charges against him. Taylor did not remember Silva's response but, he "laughed it off." When Taylor and Ms. Saldana were walking away, Ms. Saldana might have mentioned that Silva had done that to her before. Ms. Saldana also said, "You remember this in case I need you to back me up." Taylor had not heard any other complaints about Silva. She added, Silva shakes hands a lot but she has never been offended. He comments on how good she looks but she takes it as a compliment. She thought the relationship between Silva and Ms. Saldana was friendly.

Szczesny interviewed receiving clerk Rosanne Cooper on October 13, 1994. Cooper enjoyed working at the store and said that management treated her well. She had not read the harassment policy posted in the back room but said there were inappropriate comments "every day" and "all" of the females had been harassed by other employees or vendors. For example, when she was going through a divorce, Silva told everyone about it. When she was in a bad mood, Silva told her she needed to meet a man and have sex. Additionally, during "horseplay," Silva would grab her from behind by the waist or the shoulders. She stated that on the day of the Barajas incident, Silva was "rowdy" and in a great mood; Ms. Barajas was not in a good mood. Cooper had heard Silva comment on how pretty Ms. Saldana is and on Ms. Barajas's weight. She had heard Ms. Saldana complain about the way Silva looked at her. Cooper felt that Ms. Barajas was honest.

Szczesny interviewed courtesy clerk Karen Johnson on October 18, 1994. Johnson had worked at the store since 1991 and liked her job. Johnson told Szczesny Silva once suggested she could lose weight if she retrieved more shopping carts. She felt Silva was vindictive; he would schedule people for late shifts or cut their hours if he was angry with them. Ms. Saldana had complained to her about Silva "touching" her "since June or so."

At a sexual harassment training session, Kelly Flowers, a "Fourth Person" (employee in line for a management position), commented that Silva was "trouble waiting to happen" and that he was just like the offending store manager in the training film (demonstrating sexual harassment). Szczesny interviewed Flowers on October 21, 1994, to follow up on those comments. Flowers told Szczesny she had been warned about Silva when she transferred to his store. Several people (she could not recall who) told her he was "real friendly" and "likes the girls." She said several other people had

commented during the harassment training film scene with the manager, "There's [Silva]."

Flowers believed Ms. Saldana's allegations were credible because Ms. Saldana had told her about Silva "slapping her butt" prior to the Barajas incident and also mentioned that she had a witness. Flowers thought that Ms. Saldana had identified Taylor as the witness. Silva had patted Flowers's leg while they were in his office. She was not offended; it was "no big deal." Flowers said that Silva had recently yelled at Ms. Saldana and told her to get into her checkstand while Ms. Saldana was trying to talk to him about a customer complaint.

On October 21, 1994, Szczesny interviewed Sue Krukiel, a journey clerk who had worked for Lucky for over 20 years. She told Szczesny she liked the working environment overall but had two incidents she wanted to bring to his attention. One day over a year ago, she was not feeling well. Silva gave a banana to a former courtesy clerk and said, "Give this to Sue, maybe she will feel better." The comment could be taken several ways, but Krukiel thought it was offensive. On another occasion, when Silva was upset about productivity, he had yelled at her and used profanity.

After the initial interviews, Szczesny reinterviewed several employees to clarify certain issues. On October 29, 1994, he spoke with Ms. Barajas again. Ms. Barajas said she used the phrase "Are we having a bad day" with many people but she had never pinched Silva's cheeks. She did not remember Silva telling her boyfriend that he should take good care of her, and she never thanked him for complimenting her around her boyfriend. Silva had told her she was mean and was lucky to have a nice boyfriend. Ms. Barajas said she was sometimes "mean" to Silva because of the way he treated people.

On October 29, 1994, Szczesny reinterviewed Brenda Taylor. She did not recall talking to anyone about harassment prior to talking to him on October 8, 1994. Taylor did not recall saying anything to Ann Williams about taking Manuel Silva (the produce manager) "down," but she may have told Boulter in jest that Manuel should be careful or he might be next. Manuel was a "touchy person" and had the habit of putting his arm around her. She had not asked him to stop because she did not want to hurt his feelings. She noted that Manuel had not put his arm around her since the incident with Silva. Taylor said she liked Silva; he was good to her.

On October 30, 1994, Szczesny interviewed Ms. Saldana again. She was working at a different Lucky Store and did not want to go back to Silva's

former store. Ms. Saldana remembered calling Silva a "sexist pig." She said she says things like she hates men and men are pigs because of problems in her personal life. She also told Szczesny that although she liked everyone at the store, she would commonly say she was "sick of this place" because she was called in to work on her day off. She did not recall telling Chuck Flanery that she was going to "get them back."

On November 7, 1994, Szczesny spoke with Silva for the third time. Szczesny explained that Lucky had conducted numerous interviews and there were several issues he wanted to clarify. In response to Szczesny's questions, Silva said he was familiar with Lucky's sexual harassment policy. It forbade pinching, touching and "stuff like that." Silva opined that to continue to touch someone after they told you not to was harassment. He had attended a sexual harassment training session about two years earlier and remembered receiving and signing off on the store's policy. He denied violating the policy.

Silva denied making sexually suggestive comments or touching any employee other than Ms. Saldana. He stated when Ms. Barajas ran into him, he might have grabbed her arms below the shoulders so she would not fall. He recalled Boulter saying, "Oh my gosh," and he replied, "What's the matter? I did not do anything wrong." He did not explain why he did not remember that conversation at the earlier interview.

Regarding the incident with Ms. Saldana, Silva said that Ms. Saldana was showing Diana Jackson that she could get the melons out of the bin. She was teetering on the edge of the bin. He slapped the back of her leg with the back of his hand to get her attention; he did not want her to fall in. Silva was sure it was Jackson rather than Taylor who had witnessed the incident. However, Jackson told Szczesny she did not remember any incident with Ms. Saldana and Silva; Jackson heard that Taylor had witnessed such an incident.

Silva relayed that he might slap a male employee on the rear when things were going smoothly, like a football coach would. He had not slapped any woman other than Ms. Saldana and she did not say anything about being offended.

Szczesny told Silva that most people interviewed described him as a "touchy/feely" person, yet Silva denied touching any woman other than the incidents with Ms. Saldana and Ms. Barajas. Silva then acknowledged he had poked people in the ribs and might touch them on the shoulder to get their attention. He also said he might pat their leg if they were sitting next to him.

Silva believed Ms. Saldana might be motivated to "get him" because he had disciplined her for talking at the checkstand with Ms. Barajas. Silva reiterated that Ms. Barajas pinched his cheeks and asked if he was having a good day once or twice a week. Paul Lucas and Randy Ducummon had witnessed those incidents.

Szczesny spoke with Paul Lucas who said he had seen Ms. Barajas do those things on a few occasions. Randy Ducummon said that Ms. Barajas asks, "are we having a good/bad day" but he had never seen her pinch anyone's cheeks.

After completing the investigation, Szczesny summarized his findings as follows:

"I believe it is reasonable to assume that both of the incidents . . . took place. [Boulter] confirmed [Ms. Barajas'] statement of the events that took place on October 7th. Additionally, [Silva] confirmed that [Ms. Barajas] was running back to the restroom and that he bent down as though he was going to tackle her. [Silva] said that she ran into him, although he said that he did not touch her on the butt.

"Regarding [Ms. Saldana's] allegation, [Taylor] confirmed that she heard [Silva] slap [Ms. Saldana], although she did not see where [Silva] slapped her. [Taylor] heard the comment, 'I can get you for harassment' and [Ms. Saldana] told [Taylor] immediately after the incident that [Silva] 'slapped her on the ass.' When I spoke with [Silva] on October 9th, he confirmed that he slapped [Ms. Saldana] when she leaned into the melon bin, however, he said he slapped her on the back or side of the leg. [Ms. Saldana's] credibility is further strengthened as she told Kelly Flowers (Fourth Person) that [Silva] has slapped her on the butt 4-5 weeks ago.

"Although [Silva] and several other people stated that [Ms. Saldana] and [Ms. Barajas] had gotten in trouble recently for checkstand chatter and dress code, it is still reasonable to believe that these two incidents took place. There was a feeling among several of the employees including [Ms. Saldana], [Ms. Barajas], Chuck Flanery, and Susan Krukiel that [Silva] was an intimidator. This can explain why [Ms. Saldana] did not bring up an [sic] allegations against [Silva] when the incidents took place.

"Most of the employees I interviewed stated that [Silva] is a 'touchy/ feely' person, however, few employees stated that he is offensive. . . . [I]t was said that [Silva] 'shakes hands a lot,' 'pats me on the leg,' or 'grabs me by the shoulders or waist.'

"There were also several employees that have been offended by comments that have been made at the store. [Cooper] said that comments were made by [Silva] regarding her needing to find a man to have sex. [Krukiel] was told by a courtesy clerk (Marilyn) that [Silva] told her to give [Krukiel] a banana to make her feel better. [Ms. Barajas] and [Ms. Saldana] said that [Silva] has commented that if he was younger, he would try to date them. [Taylor] said that [Silva] has commented on how good she looks, although she takes it as a compliment. None of the employees said that [they] told [Silva] that they were offended.

"There were some employees who raised some concerns regarding this issue. Ann Williams stated that Brenda Taylor told her that they should 'take down' Manual [sic] Silva next. Chuck Flanery stated that he was told by [Ms. Saldana] that 'I'm sick and tired of this God damn place and I would do anything to get back at them.' Chuck thinks that [Ms. Saldana] encouraged [Ms. Barajas] to complain."

Lucky's evidence demonstrates an appropriate investigation under the circumstances. Lucky utilized Szczesny, an uninvolved human resources representative, to investigate the charges. Szczesny had been trained by in-house counsel on how to conduct an investigation. Szczesny investigated the complaints promptly and memorialized his findings on Lucky's witness interview forms. He had important witnesses provide their own written statement regarding the events at issue.

Szczesny asked relevant, open-ended, nonleading questions. He attempted to elicit facts as opposed to opinions or supposition. He maintained confidentiality by conducting a number of interviews off the store premises or by telephone. He encouraged those he interviewed to page him if they wanted to talk with him again. The record does not indicate how Szczesny determined which independent employees to interview. Apparently, various employee witnesses gave him additional names of persons who might provide pertinent information. Szczesny's notes indicate those interviewed were generally happy with their jobs, i.e., they were not disgruntled employees.

Szczesny notified Silva of the charges promptly and afforded him an opportunity to present his version of the incidents. He encouraged Silva to call him if he wanted to talk with him again and Silva called Szczesny the next day to provide more information.

Szczesny provided the critical witnesses with an opportunity to clarify, correct or challenge information provided by other witnesses which was contrary to their statements or which cast doubt on their credibility. After

interviewing all the other witnesses, Szczesny gave Silva a final opportunity to comment on the information he had gathered. As such, Lucky's investigation of the sexual harassment allegations meets *Cotran*'s fairness requirements. Lucky listened to both sides, advised Silva of the charges and provided him with ample opportunity to present his position and to correct or contradict relevant statements prejudicial to his case. (*Cotran v. Rollins Hudig Hall Internat., Inc., supra,* 17 Cal.4th at p. 108.)

Silva contends there are triable issues of fact as to whether Lucky's investigation was appropriate under the circumstances. He submits the evidence shows that Lucky failed to interview key people, ignored substantial exculpatory evidence and was swayed by rumor, gossip and innuendo. We will consider each contention in turn.

First, Silva asserts that Troy Boulter, who was Ms. Barajas's corroborating witness, gave such a "completely different version" of the incident that Szczesny should have been alerted to the possibility of fabrication. Not so; the differences in the two statements are minor. Although Boulter said Ms. Barajas walked rather than ran into the back room, that variation does not render the reports inconsistent in any material regard. In his written statement Boulter said Silva grabbed Barajas's "body"; however, he told Szczesny that same evening that Silva grabbed Ms. Barajas "on the butt" when Szczesny specifically asked him where Silva grabbed her. At his deposition, Boulter testified Silva grabbed Ms. Barajas but did not state where until prodded to do so. Boulter's reluctance to name the anatomical body part he saw Silva grab did not render his description of the incident inconsistent with Ms. Barajas's description. Nothing in Boulter's report raised an inference that Ms. Barajas had fabricated her story.

Second, according to Ms. Saldana, Brenda Taylor was present when Silva slapped her. According to Silva, Diana Jackson—not Taylor—was present at the time. Silva submits Szczesny's failure to check store records to validate who was working that day raises a triable issue regarding the adequacy of the investigation. We disagree. First, no one was sure which day the incident had occurred, so checking store records would not have been conclusive in any event. Second, Szczesny interviewed Jackson to ascertain if she had witnessed the incident. Jackson had not; she had heard that Taylor was the witness. Szczesny had already interviewed Taylor who had described the Saldana incident to him. There is no triable issue as to the appropriateness of the investigation in this regard.

Third, Silva criticizes Szczesny's failure to interview Manuel Silva who was "on duty" at the time of the Saldana incident. Absent evidence that

Manuel Silva had anything pertinent to say about the Saldana incident, Szczesny's failure to interview him does not raise a triable issue as to the appropriateness of the investigation.

Fourth, Silva claims Szczesny "ignored" information from a number of employees that challenged the credibility of Ms. Barajas and Ms. Saldana and suggested the women had ulterior motives for making the allegations. For example, Ms. Barajas tried to advance from clerk to bookkeeper but failed because she could not balance the books; she was upset about her paycheck on October 7; she "had [a] . . . grudge against" Silva, was emotional and "pout[ed]"; Ms. Saldana was manipulative; Ms. Barajas, Ms. Saldana and Troy Boulter were talking together after the Barajas incident and Ms. Barajas and Ms. Saldana were smiling.

The record demonstrates Szczesny did not ignore such comments. While his investigation summary is not as colorful as the long-after-the-fact comments of Silva's witnesses, Szczesny stated: "Although [Silva] and several other people stated that [Ms. Saldana] and [Ms. Barajas] had gotten in trouble recently for checkstand chatter and dress code, it is still reasonable to believe that these two incidents took place. . . . "

"There were some employees who raised some concerns regarding this issue. Ann Williams stated that Brenda Taylor told her that they should 'take down' Manual [sic] Silva next. Chuck Flanery stated that he was told by [Ms. Saldana] that 'I'm sick and tired of this God damn place and I would do anything to get back at them.' Chuck thinks that [Ms. Saldana] encouraged [Ms. Barajas] to complain." Because the record demonstrates Szczesny elicited and considered the information Silva claimed he ignored, there is no triable issue in this regard.

Silva next contends Szczesny "refused" to speak with Mike Coito who would have told him: He heard Brenda Taylor say they would "take down" Manuel Silva, he felt Ms. Barajas was not a good worker, and Troy Boulter had "changed his story" and said the incident was "not as significant" as he had first reported. This "evidence" does not raise a triable issue regarding the appropriateness of the investigation. Coito provided this information in a declaration dated January 1996, over a year after the fact. Further, his information about Taylor's statement was cumulative, and his feelings about Ms. Barajas's work performance were irrelevant, as was his belief that Boulter had "changed his story" after the investigation was complete.

Fifth, Silva submits Szczesny should have investigated Ms. Saldana's work history which indicated she was "a problem child." We disagree.

Szczesny's reports indicate Ms. Saldana was the less credible complainant. Szczesny did not ignore evidence favorable to Silva in this regard. His summary reports her recent discipline and the concerns voiced by several employees regarding her motives. Despite Ms. Saldana's credibility problems, however, Szczesny concluded her report of sexual harassment was probably true because Taylor heard the slap followed immediately by Saldana's sexual harassment comment to Silva, and two additional employees reported that Ms. Saldana told them of the incident prior to the Barajas incident. Silva has not raised a triable issue of fact regarding the adequacy of the investigation in this regard.

Sixth, Silva argues that Szczesny failed to investigate "some of the more outrageous . . . charges" against Silva which called into question the credibility of the reporting witness. The only example given, however, is deposition testimony in December 1995, long after the investigation was complete.

Finally, Silva contends Szczesny ignored positive comments about him from Ann Williams and failed to interview Barbara Rogers, another long-term employee, who would have told Szczesny that it would be out of character for Silva to have engaged in the conduct alleged. The absence of these statements did not raise a triable issue as to the appropriateness of the investigation. While Silva denied touching either complainant in a sexual manner, he admitted touching them. He also admitted tickling female employees, touching them on the shoulder and patting their leg; he admitted slapping male employees "on the rear." Silva's own admissions indicate either that Williams and Rogers were unaware of Silva's activities with other employees or they had aberrant ideas as to what constituted appropriate physical contact in the workplace.

None of Silva's evidence raises a triable issue regarding the appropriateness of Lucky's investigation under the *Cotran* standard. While the investigation was not perfect, it was appropriate given that it was conducted "under the exigencies of the workaday world and without benefit of the slow-moving machinery of a contested trial." (*Cotran* v. *Rollins Hudig Hall Internat., Inc., supra*, 17 Cal.4th at pp. 105-106.)

(c)  *Objective Reasonableness of Lucky's Factual Determination of Misconduct*

Lucky asserts that Silva's admissions in response to its motion for summary judgment negate any triable issue of fact on the third *Cotran* element.

Silva agreed the following facts were undisputed: (1) after completion of the investigation, Szczesny concluded "it is reasonable to assume that [the Barajas and Saldana incidents of sexual harassment] took place"; (2) based on the investigation, Lucky's review board concluded Silva had violated the store's sexual harassment policy; (3) based on the investigation, Lucky believed the Barajas and Saldana complaints of sexual harassment against Silva; and (4) Lucky believed it had good cause to terminate Silva for violation of company policy. Silva, on the other hand, contends there are triable issues of fact as to whether Lucky had substantial evidence to support an objectively reasonable conclusion that Silva had sexually harassed Ms. Barajas and Ms. Saldana.

Silva's admissions do not dispose of the issue but additional evidence presented in the trial court demonstrates there are no triable issues as to whether Lucky reasonably determined it had good cause to terminate Silva's employment for violation of company policies.

■ *Cotran* defined "good cause" in the context of an implied employment contract as "fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary or capricious, unrelated to business needs or goals, or pretextual. A reasoned conclusion . . . supported by substantial evidence . . . ." (*Cotran v. Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th at p. 108.)

■ As a preliminary matter, Silva does not contend that Lucky's reasons for terminating his employment were trivial, arbitrary, unrelated to business needs or pretextual. Silva conceded he was terminated for violation of Lucky's policies and procedures, following an investigation of reports by two subordinate female employees that he had sexually harassed them. He also conceded that sexual harassment by a store manager of subordinate female employees constituted good cause to terminate the manager. Thus, the issue presented is whether Silva raised a triable issue of fact as to whether Lucky's determination that he engaged in the alleged sexual harassment constituted a reasoned conclusion supported by substantial evidence. We find no triable issue of material fact for this *Cotran* element.

Ms. Barajas and Ms. Saldana reported conduct by Silva which undisputedly constituted sexual harassment under Lucky's policy. Both incidents were witnessed by other employees who corroborated that the conduct occurred. Silva admitted he had physical contact with both women, but denied its sexual nature. A number of other employees told Szczesny that Silva engaged in conduct—sexual innuendo, suggestive comments, physical

contact—which violated Lucky's sexual harassment policy. These reports constitute substantial evidence which supports Lucky's conclusion that Silva engaged in the sexual harassment of which he was accused.

In response to Lucky's motion for summary judgment, Silva argued in the trial court that Lucky should not have terminated his employment because he denied the allegations of sexual harassment. In addition, Lucky was unjust in terminating his 28-year employment simply on the word of Ms. Barajas and Ms. Saldana. Neither ground raises a triable issue regarding the reasonableness of Lucky's decision to terminate his employment.

In his supplemental brief, Silva contends there are triable issues of fact as to whether Lucky's decision to terminate his employment for violation of company policies constitutes a reasoned conclusion supported by substantial evidence under *Cotran*. Specifically, Silva cites evidence that Szczesny "relied on double and triple hearsay" as well as gossip and rumor. For example, Brenda Taylor told Szczesny she was told that Silva "is a 'skirt-chaser' since his divorce"; Kelly Flowers told Szczesny she was warned about Silva before she transferred to his store; several people told her Silva was real friendly and "likes the girls."

Such comments may be a predicable result of factfinding proceedings conducted without the procedural formalities of a trial. (*Cotran* v. *Rollins Hudig Hall Internat., Inc.*, *supra*, 17 Cal.4th at p. 108.) They are not substantial evidence. However, while Szczesny included such comments in his investigation notes, they did not form the basis for his conclusion that the Barajas and Saldana incidents had probably occurred. Those conclusions were based on the statements of the complainants, the percipient witnesses to the incidents and Silva's admissions that physical contact had occurred in both incidents. Accordingly, Silva has not raised a triable issue of fact as to whether Lucky's decision to terminate his employment for violation of company policies constituted a reasoned conclusion supported by substantial evidence under *Cotran*.

### 2. *Whether Silva was an at-will employee is moot.*

One of the grounds asserted by Lucky and given by the court for the summary judgment order was that Silva was an at-will employee subject to termination without cause. Silva contended there was an implied agreement wherein Lucky agreed that Silva could be terminated only for good cause. In light of our conclusion that Lucky had good cause for terminating Silva's employment, we do not reach the question of whether there was a triable issue of fact concerning the existence of such an agreement.

## DISPOSITION

Affirmed. Costs to respondents.

Stone (W. A.), Acting P. J., and Dibiaso, J., concurred.