Filed 12/11/13  Ogunsanya v. Abbott Vascular CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| CHARITY OGUNSANYA, | |
| Plaintiff and Appellant, | E054920 |
| v. | (Super.Ct.No. RIC535383) |
| ABBOTT VASCULAR, INC., | **OPINION** |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County.  Gloria Trask and Michael B. Donner, Judges.[1]  Affirmed.

Law Offices of Walter H. Root and Walter H. Root for Plaintiff and Appellant.

Kronick, Moskovitz, Tiedemann & Girard, David E. Morrison and Margaret J. Grover for Defendant and Respondent.

---

[1]     Judge Trask denied the ex parte application to strike.  (See part II.A, *post*.) Judge Donner made all of the other rulings challenged on appeal.

Charity Ogunsanya, who is Black and from Nigeria, was fired from her job with Abbott Vascular, Inc. (Abbott). In this employment discrimination action, the trial court granted Abbott's motion for summary judgment. It ruled that Abbott had proven, beyond a triable issue of fact, that it fired Ogunsanya for legitimate, neutral, and nondiscriminatory reasons — primarily that she had threatened to retaliate against employees who complained to Human Resources (HR), and she had threatened to retaliate against a vendor who had hired away one of her subordinates.

Ogunsanya appeals. Although she raises numerous points, most of them fall under one of two headings. First, she argues that there was evidence that she never made the supposed threats, and hence that Abbott's claimed reasons for firing her were pretextual. We will conclude, however, that Abbott had information from multiple sources that she did make the threats, and it had no information to the contrary other than her denial. Second, she argues that there was evidence that she was fired as the result of a conspiracy between her bosses and her racially prejudiced underlings. We will conclude that, while there was some evidence that some of her underlings were racially prejudiced, there was no evidence of any such conspiracy.

I

PRELIMINARY STATEMENT

This is a fact-intensive case. Nevertheless, Abbott has been content to submit a totally inadequate statement of facts.

2

Abbott cites its own separate statement as the *sole* support for *all* but two sentences of its statement of facts. This is improper: "Assertions of fact on summary judgment . . . appeals are *not* supported by appropriate references to the record when the brief cites *only* to a party's 'separate statement' . . . . 'As to statements of fact, . . . a [citation] separate statement is not evidence; it *refers* to evidence submitted in support of or opposition to a summary judgment motion. In an appellate brief, an assertion of fact should be followed by a citation to the page(s) of the record containing the supporting evidence.' [Citations.]" (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶ 9:39.5, pp. 9-14; *State of California ex rel. Standard Elevator Co., Inc. v. West Bay Builders, Inc.* (2011) 197 Cal.App.4th 963, 968, fn. 1; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 178, fn. 4.) It is particularly shoddy to cite one's own separate statement when the other side has listed the cited "fact" as "disputed." In that event, the only way this court can determine whether the dispute is genuine or not is to look at the supporting *evidence*.

As if this were not enough, Abbott then adds gratuitous material that is not even supported by its own separate statement. For example, in its brief, it states: "Based on these complaints, [Amy] Martin opened a case with Employee Relations, and Abbott assigned Rosalie Lewis, a female *African-American* E[mployee] R[elations] investigator *located in Chicago*, to investigate the allegations." (Italics added.) The cited portion of the separate statement contains no support for the italicized language. We have found, on our own, some evidence that Lewis was based in Chicago, but no evidence that she was

3

African-American.  And, as Abbott knows perfectly well, these supposed facts are material; on the very first page of its brief, it specifically argues that Lewis's race and work site are proof that she was unbiased.  And this is only one instance of several such gratuitous insertions.[2]

We considered striking Abbott's brief and ordering Abbott to file a new one.  (See Cal. Rules of Court, rule 8.204(e)(2)(B).)  However, Ogunsanya had already filed her reply brief, and it would be unfair to put her to the effort and expense of filing another.  Alternatively, we could disregard all of Abbott's factual statements.  (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 683, fn. 1.)  This does not help, however, as we are still put to the trouble of reviewing the record and coming up with our own statement of facts.

Under the circumstances, the only feasible sanction is to take Abbott's inadequate statement of facts into account in awarding costs on appeal.  (See part VII, *post*.)

---

[2]    At oral argument, counsel for Abbott claimed that Ogunsanya had conceded, in her appellant's brief, that Lewis was African-American.  Having combed through Ogunsanya's brief, we have managed to verify that she briefly mentions this.  Nevertheless, this fact was never before the trial court.  Abbott's brief — by stating it as a fact and by citing it solely to the trial court record — misleadingly suggests otherwise.

Even more to the point, if Abbott actually did have any support for its challenged factual statements, the time to cite that support was in its brief, not at oral argument.

## II

## THE PROPRIETY OF CONSIDERING ABBOTT'S REPLY EVIDENCE

Ogunsanya contends that the trial court erred by overruling her objection to evidence that Abbott filed along with its reply papers. Thus, before we can provide a statement of facts, we must first determine what evidence we can consider.

A.     *Additional Factual and Procedural Background.*

Abbott's reply papers included about 150 pages of excerpts from some 14 depositions. Ogunsanya filed an ex parte application to strike Abbott's reply evidence as "unauthorized and . . . a deprivation of plaintiff's due process rights." The trial court denied the application.

At the hearing on the motion for summary judgment, Ogunsanya's counsel argued, among other things, that it would be a denial of due process to consider Abbott's reply evidence.

The trial court ultimately ruled that it had the "power to consider" Abbott's reply evidence because Ogunsanya was not prejudiced; she had "had the benefit of a lengthy continuance from the date originally set for hearing, June 14, 2011, to the date on which the hearing occurred, June 29, 2011." However, it also stated that, in ruling on the motion, "the court has not relied on any evidence introduced for the first time with Abbott's reply."

B.     *Analysis*.

Abbott argues that Ogunsanya's argument is "moot" because the trial court did not consider the reply evidence.[3] We agree that the error, if any, is harmless. The trial court ruled in Abbott's favor without even considering the reply evidence. Moreover, as will be seen, we can affirm this ruling without the need to consider any of the reply evidence. Accordingly, our statement of facts is drawn exclusively from the evidence submitted in the moving and opposition papers.

III

FACTUAL BACKGROUND

The "dramatis personae" of this case gets rather complicated. In the hope of assisting the reader, a diagram is included as attachment A.

A.     *Ogunsanya Is Hired*.

In April 2006, Abbott hired Ogunsanya as the manager of its Microbiology Department. She was responsible for supervising approximately 45 employees in four locations. All of her performance reviews were favorable.

B.     *Employees Complain About Ogunsanya's New Hires*.

Ogunsanya is from Nigeria. She hired two new employees who were also Nigerian (Emmanuel "Emmy" Osiegbu and Koyejo "Koye" Obadina) for supervisory positions. Other employees complained that she was showing favoritism by hiring fellow

---

[3]     In light of Abbott's position on this issue, we deem it to have forfeited any reliance on any of its reply evidence.

Nigerians "rather than recruit[ing] locally or promot[ing] from within." Some people referred to an "African connection" in the Microbiology Department, meaning "that [they] all knew each other . . . and we're all from the same country." The new employees were viewed as "Charity's favorites."[4] There were complaints that they "didn't meet the standards" for their positions.[5] There were also complaints that Osiegbu's accent made him hard to understand.[6] The employees who complained included Tim Farmer, Sara Plumley, Danny Sanchez, Matthew Stetson, Donna Horner, Kerry Hart, and Kristin Stiles.

Abbott investigated these complaints and determined that they were unfounded.

Employee Relations (ER) notified Ogunsanya of the complaints, which she understood to be that she was hiring too many African-Americans and that African-

---

[4] Zenabu "Zaina" Bawa, who was either hired or, more likely, promoted by Ogunsanya, was also said to be one of "Charity's favorites."

[5] At the same time, there were also complaints that Ogunsanya had promoted certain non-African-American employees who were supposedly unqualified.

[6] Ogunsanya asserts: "The racial tension in [the] department became impossible to ignore." The only evidence on this point, however, was to the contrary. Bawa testified:

"Q: Were you aware of racial tensions within the Microbiology Department? [¶] . . . [¶]

"THE WITNESS: Tension, yes; racial, I don't know. [¶] . . . [¶]

"Q: Okay. Who was the tension between?

"A: Almost everyone."

Americans in general are not qualified to be leaders. She considered these complaints to be racist. She notified an executive who was in charge of investigating discrimination complaints. However, no investigation was ever carried out.

C.      *Employees Complain about Ogunsanya.*

Amy Martin was a senior HR manager. In or about July 2008, she received the following four complaints about Ogunsanya.

1.      *Anonymous e-mail.*

An anonymous e-mail claimed that people who had complained to HR about Ogunsanya's management had suffered retaliation.

2.      *Plumley complaint.*

Plumley wanted to transfer to a job outside the Microbiology Department. Ogunsanya delayed the transfer and, in Plumley's view, "g[ave] her a hard time." Plumley complained to Martin.

3.      *Hart complaint.*

Hart wanted to apply for a higher-level position.[7] Ogunsanya told her not to apply because "it would be too much paperwork to replace [her]." When Hart applied anyway, the position was downgraded so that it was no longer a promotion for her.

Plumley advised Hart to complain, explaining: "[T]his is a good time to complain because they are listening." Hart then complained to Martin.[8]

---

[7]      Ogunsanya asserts that, under Abbott's policies, Hart was not eligible for the position. The cited portions of the record, however, fail to support this.

4.    *Farmer complaint.*

On July 7, 2008, Farmer told Ogunsanya that he had resigned to take a job with Lonza. Lonza was one of Abbott's vendors; thus, Farmer would be servicing Abbott's equipment.

Ogunsanya's immediate reaction was to wish him good luck. However, "it just didn't seem right" to her that he would be "using the training and proprietary information given to him at Abbott to service Abbott equipment for an outside vendor." She therefore asked Abbott's legal department whether Farmer would be breaching his or Lonza's contract with Abbott if he went to work for Lonza.

On July 8, 2008 — before receiving a response from the legal department — Ogunsanya phoned Jennifer Harrington, a sales representative with Lonza.

According to Harrington, Ogunsanya was "aggressive" and "unfriendly." She "expressed a lot of displeasure with the fact that a vendor would hire from an existing client . . . ." She added that Abbott was "a large account" for Lonza, and she threatened to "take her business elsewhere."

According to Ogunsanya, however, she called Harrington just to make sure that she was giving the legal department correct information. To be "discreet," she did not mention Farmer by name, and she let Harrington bring up the subject of his new job. She

_____

*[footnote continued from previous page]*
**8**    Ogunsanya asserts that Martin "prompted" Plumley and/or Hart to complain to her. The cited portions of the record do not support this.

9

denied "threaten[ing] to pull Abbott's business from Lonza or indicat[ing] that I was displeased with Farmer's decision."

Harrington promptly went to Farmer with her version of the conversation. On July 9, 2008, Farmer complained to Martin.

On or before July 11, 2008, the legal department advised Ogunsanya that Farmer was not breaching his or Lonza's contract. On July 15, 2008, Ogunsanya met with Farmer. Despite the advice that she had received from the legal department, she told him that he was causing Lonza to be in breach of contract.

Lonza was not a unique vendor; there were other companies that could provide the same services.[9] In June, before Ogunsanya knew Farmer was leaving, she had scheduled a meeting with Cape Cod, one of Lonza's competitors. She wanted to find out if she could save money for Abbott by replacing Lonza. That meeting was set for July 18, 2008.

D. *Lewis Investigates.*

Meanwhile, based on the complaints from Hart, Plumley, Farmer, and the anonymous e-mail, Martin opened a "case."

On July 11, 2008, Rosalie "Rose" Lewis was assigned to investigate. Lewis was an Abbott ER manager based in Chicago. During her investigation, she never left

---

[9]     Ogunsanya asserts that Abbott was already "consider[ing]" terminating its relationship with Lonza. The cited portion of the record, however, does not support this.

Chicago; she conducted all of her interviews by phone. She interviewed a total of 21 people, some more than once.

Fourteen employees told Lewis that Ogunsanya had told them not to take concerns or complaints to HR and had threatened them with "repercussions" if they did.[10] For example, Nicholi "Nick" Gomez said she had told employees to "go through her if we had problems, because if we didn't she would find out."

Gomez later testified that Ogunsanya told employees: "[If you have] any problems, . . . you should go to her first instead of H.R. . . ." She added: "I'm going to know if you contact H.R." He was "scared."

Horner testified that Ogunsanya said that an employee with an issue should talk to her first; then, if the issue was not resolved, the employee could go to HR. However, she added that it "comes right back to her."

Ogunsanya testified that she did not tell employees not to go to HR or threaten to retaliate if they did. She stated: "I merely asked them to come to me first if there was a chance we could solve the department's problems together without outside intervention."

---

**10** Ogunsanya objected to this evidence as hearsay. The trial court overruled her objection. She now contends that this was error.

Certainly the employees' statements to Lewis were not admissible for their truth. (Evid. Code, § 1200, subds. (a), (b).) However, they were admissible for a nonhearsay purpose — "to establish that the investigation took place, that it was appropriate under the circumstances and that the termination decision was reasonable based on that information." (*Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 265.)

11

Employees also told Lewis that Ogunsanya had discouraged them from applying for new positions. When one employee resigned, Ogunsanya refused to accept her resignation. The employee felt threatened; she was afraid Ogunsanya would contact her new employer. Ogunsanya threatened several employees with layoffs if they took positions outside her department. She discouraged employees from applying for open positions within the department, saying "it was too much paperwork."

Harrington confirmed to Lewis that Ogunsanya had threatened to "pull [Lonza's] contract" if it hired Farmer.

E.      *Ogunsanya Is Suspended and Then Fired.*

On July 18, 2008, Gomez gave Ogunsanya a list of three employees who had "gone to HR." She then went and spoke to each of them "one-on-one." She asked them to tell her who had gone to HR; she added that she already had a list, and she just wanted confirmation. When one employee denied speaking to HR, Ogunsanya replied: "[G]ood, it[']s better if you[']re not involved, you[']re one of my good employees." When another employee refused to give her any names, she said: "[O]k[ay,] that means that you called HR."

These employees immediately reported this to Lewis. Ogunsanya later testified, however, that when the employees admitted going to HR, she simply "reaffirmed to them that they had an absolute right" to do so.

12

Later on July 18, 2008, Ogunsanya attended a meeting with Martin. Also at the meeting were Barbara Nollau, who was Ogunsanya's boss, and Steve Wirkus, who was Nollau's boss. Lewis participated in the meeting by phone.

During the meeting, Ogunsanya denied contacting Harrington and threatening to "pull Lonza's contract." Nollau asked if Cape Cod was a competitor of Lonza; Ogunsanya lied and said "No." She also denied telling employees not to go to HR. According to other attendees, Ogunsanya denied questioning employees about whether they had gone to HR. According to Ogunsanya, however, she admitted doing so.

Ogunsanya was asked to wait outside. The others discussed the matter and decided to suspend her. They called her back in and told her that she was suspended. At the time, she was seven months pregnant. On July 21, 2008, she went out on maternity leave.

Meanwhile, in Ogunsanya's absence, Osiegbu and Jacqueline "Jacque" Lee attended the meeting with Cape Cod. The Cape Cod representative told them that Ogunsanya had said she was "very angry" with Lonza. They reported this to Lewis. Ogunsanya later testified, however, that she never said this to Cape Cod.

On July 22, 2008, Lewis drafted a written recommendation that Ogunsanya be fired. Consistent with the anonymous e-mail, she found that Ogunsanya had instructed employees not to go to HR and had threatened to retaliate against them if they did.[11]

---

[11]     Ogunsanya states: "The employees whose complaints allegedly triggered Lewis' investigation were . . . Plumley, . . . Farmer and . . . Hart. . . . None of them

*[footnote continued on next page]*

Consistent with Hart's complaint, she found that Ogunsanya had discouraged employees from applying for different positions. Consistent with Farmer's complaint, she found that Ogunsanya had told Lonza that "she would pull Abbott's contract if [Farmer] came to work for them."[12] Lewis concluded that Ogunsanya had violated multiple Abbott policies, including those pertaining to "Employee Relations," "Workplace Harassment," "Problem Solving," "Fair Dealing," and "Accountability."

Nollau, Wirkus, and Susan Slane, who was Wirkus's boss, all reviewed Lewis's recommendation; they all agreed that Ogunsanya should be fired. Accordingly, on December 4 or 5, 2008, after Ogunsanya had used up her short-term leave, she was fired. She responded: "[T]his [i]s racist and [I] want[] to appeal."

On December 12, 2008, Ogunsanya lodged a written appeal in which she alleged: "I was discriminated against because I am an African . . . ."

---

*[footnote continued from previous page]*
complained about being threatened with retaliation if they went to Human Resources with a problem. That particular justification . . . was concocted only after it became clear that the complaints of Plumley, Farmer and Hart would not suffice to justify Ogunsanya's termination."

This ignores the anonymous e-mail, which had complained about threats of retaliation against employees who went to HR. Martin specifically testified that she opened a case based, in part, on the anonymous e-mail.

[12] Lewis had interviewed Plumley, but her recommendation did not refer to Plumley's complaint. It is inferable that she considered it unfounded. Nollau believed that Plumley herself was to blame for "act[ing] unprofessionally through th[e] transition . . . ."

On January 2, 2009, Ogunsanya met with Gomez in the hope of obtaining information to support her appeal. He proceeded to reveal the following.

He told her that certain employees had made "jungle animal sounds" whenever an African-American came into a room, "both to mock African-Americans and as a warning signal to others so that they would be careful what they said . . . ." Ogunsanya had heard Farmer, Plumley, and Stetson make such sounds on three occasions. At the time, however, she did not "read any meaning" into the sounds and "thought little of it."

He also told her that the employees who made the sounds "planned to get rid of all the African-Americans in the department . . . ."

He told her that Farmer, Stetson, and Sanchez referred to Osiegbu as "Charity's boy."

He told her that Farmer had induced employees to complain to HR by handing out HR's phone number and then nagging them, asking: "[H]ave you called, have you called, have you called[?]"

He also told her that Sanchez had induced employees to complain to HR by dialing HR's number, then holding the phone up to their ear.

On January 21, 2009, Ogunsanya's appeal was denied. She was replaced by a White male.

Additional facts will be discussed below as they become relevant.

15

IV

EVIDENCE OF PRETEXT

Ogunsanya contends that there were triable issues of fact with respect to whether Abbott's stated reasons for firing her were pretextual.

A.    *The Standard of Review*.

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. [Citation.]" (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

"[I]n moving for summary judgment, a 'defendant . . . has met' his 'burden . . . if' he 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. . . .' [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.)

"In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 843.)

The Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12900-12996) prohibits discrimination in employment, including discrimination based on race or national origin (Gov. Code, § 12940, subd. (a)). In an employment discrimination case,

16

on a motion for summary judgment, the employer "ha[s] the initial burden to either (1) negate an essential element of [the employee]'s prima facie case [citation] or (2) establish a legitimate, nondiscriminatory reason for terminating [the employee] [citation]." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 160.)

If the employer meets its initial burden, "'[the] employee . . . must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination.' [Citation.]" (*Wills v. Superior Court*, *supra*, 195 Cal.App.4th at p. 160.)

"We review the trial court's decision de novo . . . . [Citations.]" (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 65-66.)

B.     *Threats to Retaliate Against Employees Who Went to HR.*

One of Abbott's asserted reasons for firing Ogunsanya was that she had threatened to retaliate against employees who went to HR with concerns or complaints. Ogunsanya contends that there was evidence that this reason was pretextual.

According to Lewis, a total of 14 employees said that Ogunsanya had told them not to go to HR and had threatened to retaliate against them if they did. Gomez testified that Ogunsanya said, "[If you have] any problems, . . . you should go to her first instead of H.R.," and she added, "I'm going to know if you contact H.R." Similarly, according

17

to Stiles, Ogunsanya had repeatedly told employees not to go to HR and said "she 'knows' who you are."

This violated Abbott's written "Employee Problem Solving" policy, which stated: "It is Abbott's philosophy to maintain an open and free exchange of information, problems and complaints between managers and employees. . . . [¶] . . . If an employee wants to talk . . . to a representative of Human Resources, the employee should feel free to do so, and it is Abbott policy to encourage this. [¶] No supervisor or manager should discourage employees in any way from discussing their problems with a higher level of management . . . ."

Ogunsanya argues that "[t]here is nothing wrong with asking employees to speak with management before bringing concerns to the attention of HR, *unaccompanied by any threats*." (Italics added.) As already discussed, however, the employees told Lewis that Ogunsanya did make threats to retaliate.

Ogunsanya argues that Gomez testified that she made no threat to retaliate. Gomez admitted that she made no *explicit* threat to retaliate, but he considered her statement, "I'm going to know if you contact H.R.," to be an *implicit* threat. "[S]he would . . . end it like that and walk out of the room." He was "scared."

Ogunsanya also claims that other witnesses contradicted this evidence. Bawa testified that Ogunsanya never told her not to go to HR. Lee denied telling Lewis that she feared retaliation from Ogunsanya. Lewis, however, never claimed that either Bawa

18

or Lee told her this. The fact that these two particular witnesses did not say this to Lewis fails to raise any dispute as to whether 14 *other* witnesses *did*.

Ogunsanya relies on one employee's notes, taken at a "group meeting," which said that employees should "talk to group leader or her first," but if they "[c]an't resolve [it,] then go to HR. Not trying to restrict us." However, there was no evidence that the person who said this at the meeting was Ogunsanya. And even it was, there was no evidence that these words were brought to the attention of Lewis or any of the other decision makers. "'It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case. [Citation.]" (*Johnson v. United Cerebral Palsy/Spastic Children's Foundation* (2009) 173 Cal.App.4th 740, 757.)

Finally, Ogunsanya argues that there was no evidence that she ever retaliated against an employee who went to HR. However, she did obtain a list of people who had gone to HR, and did contact them "one-on-one" to ask them if they had done so. The employees would have viewed this as retaliation. In any event, evidence that she carried out her threats was not necessary; merely making the threat violated Abbott's policies.

C.     *Threat to Pull Lonza's Contract.*

Another one of Abbott's asserted reasons for firing Ogunsanya was that she had threatened to "pull [Lonza's] contract." Ogunsanya contends that there was evidence that this reason, too, was pretextual.

19

Ogunsanya argues that she never actually made such a threat. Certainly this was a disputed factual issue. Harrington said she did; Ogunsanya said she did not. However, this was not a *material* factual issue. What matters is that Harrington told Lewis that this had happened.

Ogunsanya therefore argues that Abbott should have believed her, not Harrington. She argues that Harrington may have been trying to discredit her to prevent her from making Abbott switch to Cape Cod (for Abbott's own financial benefit). One problem with this theory is that, at the July 18 meeting, when Nollau asked if Cape Cod was a competitor of Lonza, Ogunsanya lied and said it was not. Nowhere in the record does Ogunsanya deny this. Thus, the decision makers had every reason to believe Harrington and disbelieve Ogunsanya.

Another problem with this theory is that there is absolutely no evidence that Harrington *knew* that Ogunsanya was thinking about switching to Cape Cod. A fortiori, there is no evidence that *Abbott* knew or even should have suspected that *Harrington* knew this. "[A] party 'cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]' [Citation.]" (*Dollinger DeAnza Associates v. Chicago Title Ins. Co.* (2011) 199 Cal.App.4th 1132, 1144-1145.)

Ogunsanya argues that Harrington was impeached. She claims that, in a conversation that Harrington had with an Abbott employee (Lee) about the incident, Harrington never mentioned a threat to pull Lonza's contract. Actually, Lee merely

20

testified that she did not remember much about the conversation: "I really couldn't remember what she discussed . . . or mentioned at the time." This was hardly impeaching. More to the point, again, there is no evidence that the decision makers at Abbott knew about Lee's supposedly impeaching conversation. It was therefore irrelevant to whether Abbott could reasonably rely on Harrington.

Ogunsanya further claims that Lee testified that, at meetings between Ogunsanya and Farmer, Farmer did not specifically say that Ogunsanya threatened to pull Lonza's contract. However, Farmer did ask "if his employment [with Lonza] will be jeopardized . . . ." In any event, again, there is no evidence that the decision makers were aware of this supposed impeachment.

Ogunsanya also argues that her conduct with regard to Lonza was not a genuine ground for termination. She claims that "[s]he was simply doing her 'due diligence' as a manager" by trying to determine whether Farmer had the right to go to work for an Abbott vendor. She also claims that, even if she did threaten to pull Lonza's contract, Abbott had no reason to object, because "[t]here was nothing unique about Lonza." Finally, she claims that it was perfectly appropriate for her to meet with Cape Cod, because "she was merely attempting to save money for Abbott."

The reason for her termination, however, was not that she tried to find out whether Farmer had the right to go to work for an Abbott vendor. Rather, it was that she threatened to pull Lonza's contract. She had already asked the legal department whether Farmer had the right to go to work for Lonza. If her only concern was to protect Abbott,

all she needed to do was to wait for a response. Instead, before hearing back, she proceeded to contact Lonza and (according to Harrington) make the threat.[13] Admittedly, Ogunsanya testified that she was just trying to make sure that she was giving the legal department correct information — that Farmer had in fact taken a job with Lonza, and that the job did, in fact, involve servicing Abbott equipment. Her subjective motivation, however, is beside the point. We can only repeat that Harrington claimed that Ogunsanya made the threat, and the decision makers at Abbott reasonably could and did believe Harrington.

Similarly, Abbott did not terminate Ogunsanya merely because she set up a meeting with Cape Cod. The fact that she did so, however, tended to corroborate Harrington's claim that she had threatened to pull Lonza's contract. And the fact that (at least according to the information available to the decision makers) she told Cape Cod that she was "very angry" with Lonza further tended to corroborate this.

---

[13]     Ogunsanya protests that Harrington had no authority over Farmer or over Lonza's relationship with Abbott. Nevertheless, she was a sales representative — someone likely to be responsive to threats to drop Lonza.

Ogunsanya also points out that, to be "discreet," she let Harrington bring up the subject of Farmer's hiring; she did not even speak Farmer's name. This is irrelevant, however, as she admits that she called Harrington to discuss Farmer. It is additionally irrelevant as there is no evidence that the decision makers at Abbott knew any of these details.

Abbott could and did object because this constituted retaliation, in violation of Abbott's written policies.**14** Even though Lonza could be replaced, if necessary, Abbott could reasonably have a problem with a manager hurting its relationship with Lonza by attempting to control Lonza's hiring decisions and making threats against Lonza.

D.    *Influence of Racially Prejudiced Subordinates.*

Ogunsanya contends there was a triable issue of fact with respect to whether the decision makers conspired with certain racially prejudiced subordinates of hers.

Certainly there was evidence that Farmer, Plumley, Sanchez, and Stetson were racially prejudiced. Ogunsanya occasionally heard them making "jungle animal sounds." After she was fired, Gomez revealed that they made these sounds whenever an African-American walked into the room, in part to mock African-Americans. Gomez added that they referred to Osiegbu as "Charity's boy," a racially demeaning term. Gomez also said that they were planning to get rid of all the African-Americans in the Microbiology

---

**14**    Abbott's "Employee Relations," "Workplace Harassment," and "Problem Solving" policies are in the record. These would appear to prohibit retaliation against an employee or a vendor only if it was based on a protected status, such as race, sex, or religion.

Abbott's "Fair Dealing" and "Accountability" policies are not in the record. However, Nollau testified that the "Fair Dealing" policy required "fair dealing with all of those entities that you come in contact with as part of your job," including "both internal people that work there as well as external people . . . ." Such a policy reasonably could be violated by retaliation based on something other than a protected status. Ogunsanya even conceded that retaliation or a threat of retaliation violated Abbott's code of conduct. Thus, undisputed evidence leads to the conclusion that Ogunsanya's conduct violated Abbott's policies.

Department.[15]  We may assume, without deciding, that their complaints that it was hard

to understand Osiegbu due to his African accent were also evidence of prejudice.  (See

*Zokari v. Gates* (10th Cir. 2009) 561 F.3d 1076, 1090 ["[A]n employer's comments

regarding a plaintiff's accent may constitute circumstantial evidence of discrimination

based on national origin."]; but see *Ang v. Procter & Gamble Co.* (6th Cir. 1991) 932

F.2d 540, 549 ["Unlawful discrimination does not occur . . . when a plaintiff's accent

affects his ability to perform the job effectively."].)

In addition, there was evidence that these employees made, or induced others to

make, the complaints that led to Ogunsanya's termination.  Farmer and Plumley, of

course, complained directly and on their own behalf.  Plumley also advised Hart to

complain.  Likewise, according to Gomez, Farmer and Sanchez recruited other

employees to complain; Sanchez went so far as to dial HR's number and hold the phone

up to the complaining employee's ear.  And we repeat that, at least according to Gomez,

these employees had a plan to get rid of all of the African-Americans in the Microbiology

Department.

The decision makers, however, were unaware of any of this.  As far as Lewis's

investigation revealed, and as far as the decision makers could tell, the employees'

complaints were spontaneous, sincere, and untainted by racial prejudice.

---

[15]  Abbott objected to Gomez's statements as hearsay, but the trial court overruled the objection.  Abbott does not contend that this was error.  Accordingly, we may consider this evidence.

24

Ogunsanya claims, however, that there is evidence that Bawa told Lewis that there was a plan to get rid of all the African-Americans in the department.  Actually, Bawa testified that Gomez told her that there was a plan to get rid of every African-American in the department, and he warned her that she would be "next after Charity."  Bawa reported this to someone in ER.  The ER person was female; Bawa talked to her on the phone.  Ogunsanya argues that it is inferable that the person she reported it to was Lewis.

This incident, however, evidently occurred *after* Ogunsanya was fired, as shown by Gomez's warning that Bawa would be "next."  Lewis did not list Bawa as one of the people she interviewed.  Bawa testified that Ogunsanya "left when I was gone.  I wasn't there.  I came back."  We also note that it is wholly speculative that Lewis was the person Bawa spoke to.  (See *Dollinger DeAnza Associates v. Chicago Title Ins. Co.*, *supra*, 199 Cal.App.4th at pp. 1144-1145.)  Thus, there is no evidence that the decision makers knew about the supposed plan.

Ogunsanya therefore argues that "[b]ias at any stage of the termination process may have tainted the ultimate decision."  Her entire argument on this point, however, is contained in a single sentence, followed by citations.  For example, she cites *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95; *Reeves* discussed the "cat's paw" theory of liability, which can apply "where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory

25

animus." (*Id*. at p. 116; see generally *id*. at pp. 113-116.)[16]  Elsewhere in her brief, however, she seems to disavow the cat's paw theory; she concedes that it is not enough to prove that the "malcontents" who complained about her were racially biased; rather, she must also prove that the decision makers "conspir[ed]" with them.

Ogunsanya's single sentence is insufficient to require us to consider the cat's paw theory.  "'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived.  [Citations.]' [Citation.]"  (*Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 535.)  Indeed, the argument has been doubly waived, as Ogunsanya never raised it below.

### E.    *Evidence Regarding Lewis's Investigation.*

Ogunsanya argues that there is evidence that Lewis's investigation was a sham.

First, she asserts that Lewis was asked to conduct the investigation on June 11, 2008, which would be *before* the Plumley, Hart, and Farmer complaints.  It is true that, in her deposition, Lewis said that Martin first contacted her on June 11, 2008.  However, it is clear that she misspoke.  Abbott's internal records show that Martin opened the case on July 11, 2008.  Martin testified that she opened the case after receiving the Plumley, Hart, and Farmer complaints.  Lewis testified that she was assigned to investigate complaints by employees, including Farmer.  In the trial court, Ogunsanya *conceded* that Martin

---

[16]    Here, of course, the racially prejudiced actors were subordinates, not supervisory personnel.  It is unclear whether the cat's paw theory can apply under these circumstances.  (See *Reeves v. Safeway Stores, Inc.*, *supra*, 121 Cal.App.4th at p. 109, fn. 9.)

asked Lewis to investigate the Plumley, Hart, and Farmer complaints. Lewis's slip of the tongue fails to create an issue of fact.

Next, she claims that Lewis falsified evidence. In support, she states that Lewis's notes of her interview with Lee show that Ogunsanya referred to herself as the "the mafia," yet Lee denied telling Lewis this. Lewis's notes, however, are not in evidence. Rather, during her deposition, Lewis was asked a *question* which *assumed* that her notes of the Lee interview included the "mafia" reference. Lewis then *contradicted* this, saying: "Actually, I heard that from someone else . . . ." The mere fact that Lee denied telling Lewis this fails to show that Lewis never heard this from anyone. Moreover, even assuming that Lee could contradict Lewis's notes on this point, that one isolated discrepancy would fall short of showing that Lewis's investigation as a whole was one-sided or biased.

Ogunsanya also claims that Lewis selectively chose to interview witnesses who were biased against her. There is absolutely no evidence of this. Obviously, Lewis had to interview the employees who were complaining (i.e., "biased"). However, she also interviewed witnesses who Ogunsanya does not even claim were biased against her.[17] Ogunsanya does not name any person who was *not* interviewed, but who would have contradicted the other interviewees' allegations.

---

[17]     These would include employees Marie Bagulou, Melissa Escobedo, Siena Garlejo, Gomez, Kristyn Grimett, Lee, Jesimel Marcelo, and Osiegbu.

Ogunsanya argues that she was not given an opportunity to respond to the allegations against her. However, the July 18 meeting was precisely such an opportunity. Rather than explain her actions or try to justify them, she simply denied that they had occurred. Nevertheless, when both Farmer and Harrington said that she had threatened to stop doing business with Lonza, the decision makers were entitled to believe them and disbelieve her. Likewise, when 14 employees said that she had threatened to retaliate against them if they went to HR, the decision makers were entitled to believe them and disbelieve Ogunsanya.

The record includes notes handwritten by Nollau that say, among other things, "Rose Lewis," "18 July 08," and "Badge + B[lack]Berry." Nollau explained: "Those were the things I was told to get from [Ogunsanya] before she left on her suspension." Ogunsanya concludes that "[b]efore the meeting, Lewis had already instructed Nollau to confiscate [her] employee badge and [B]lackberry." Or, in other words, the outcome of the meeting was preordained.

There was no evidence, however, that these notes were written *before* the July 18 meeting. In her deposition, Nollau initially testified that she wrote them during the meeting; later, she was not sure when she wrote them, or even if she wrote them all at the same time. The reference to "Badge + B[lack]Berry" was written under a wavy divider line; also, it was the very last item in the notes. It seems most likely that she wrote this after Ogunsanya was asked to step outside. In any event, absent any evidence that Nollau

in fact wrote it before the meeting, it fails to raise a triable issue of fact with respect to pretext.

Ogunsanya also seizes on various discrepancies among the recollections of the decision makers and argues that these are evidence of pretext.

First, Ogunsanya claims there were discrepancies about who made the termination decision. Not so. Wirkus testified: "[Ogunsanya] reported directly to [Nollau], so it was [Nollau]'s decision, but we were all aligned." Nollau testified similarly that "[Martin] had come with the recommendation and . . . we all talked about it after that and agreed to support the recommendation and go forward." Martin did not contradict this; she merely testified that it was Lewis who made the "initial determination" to prepare a termination review worksheet.

Next, Ogunsanya claims that Nollau had no idea what company policies were violated and had never seen those policies until she was given them in preparation for her deposition. Actually, Nollau testified that Ogunsanya had violated the "Employee Relations," "Problem Solving," and "Fair Dealing" policies, as well as other policies that she did not remember. She further testified that all employees were trained on these policies during orientation; they merely were not given a hard copy.

Ogunsanya claims — correctly — that Wirkus misremembered what Ogunsanya supposedly said to Lonza. As he recalled, she tried to keep Lonza from hiring Farmer by saying "negative things" about Farmer. However, the mere fact that, two and a half years

later, Wirkus could no longer recall this kind of detail falls far short of showing that he actually had some other agenda.

Ogunsanya also points out that Slane could not remember the names of any employees who had complained. Once again, this is not evidence of pretext.

Finally, Ogunsanya complains about the way her suspension and termination were handled: She was escorted out of the building in full view of others; she was told not to contact Abbott employees, and they were told not to contact her; the lock on her office door was changed; an employee who was seen going into her office was questioned; and Abbott refused to give her a written statement of the reasons for her termination. Unpleasant and even humiliating as these actions may have been, they are not atypical of the way large employers handle terminations these days. Certainly Ogunsanya introduced no evidence that Abbott handled her termination any differently than the termination of any other employee. Thus, yet again, this evidence fails to raise a triable issue of fact with regard to pretext.

V

EVIDENCE OF FAILURE TO INVESTIGATE

According to Ogunsanya, Abbott also violated its duty under FEHA "to take all reasonable steps necessary to prevent discrimination and harassment from occurring" (Gov. Code, § 12940, subd. (k)) by failing to investigate four separate reports of discrimination.

30

"An actionable claim under [Government Code] section 12940, subdivision (k) is dependent on a claim of actual discrimination: 'Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented.' [Citation.]" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021.)

Two of the cited reports were by Bawa; they were both made after Ogunsanya had already been suspended or terminated. As mentioned (see part IV.C, *ante*), Bawa told someone from ER that there was a plan to get rid of her and all the other African-Americans in the department. Bawa also told Nollau that she felt that people did not trust her and viewed her as one of "Charity's favorites."

There is no evidence that Abbott failed to investigate Bawa's reports. Even assuming that it had the burden to prove that it did investigate, Nollau testified that she "followed up" on Bawa's report by talking to two group leaders and to Martin; she also advised Bawa to talk to Martin. Even more important, Abbott's alleged failure to investigate Bawa's reports did not result in any further harassment or discrimination against either Bawa or Ogunsanya (who was already gone). Bawa testified that Abbott had "treated [her] well"; "I don't have any problem with the company." Finally, Ogunsanya lacks standing to sue for alleged discrimination against Bawa. (Gov. Code, § 12965, subd. (b) ["aggrieved person" has private right of action].)

The other two reports were by Ogunsanya herself. First, in 2007, she told Pat Lavey, "who was responsible for investigating discrimination complaints," that some

employees felt that she was hiring too many African-Americans and that those hires were unqualified. Ogunsanya also told Lavey that she "considered th[o]se complaints to be racist."[18] There was never any investigation of her complaint. The failure to investigate, however, did not result in any harassment or discrimination against Ogunsanya. Ultimately, she was terminated for legitimate, nondiscriminatory reasons.[19]

Next, after she was terminated, she filed an internal appeal in which she alleged: "I was discriminated against because I am an African . . . ." Her appeal was denied "based on the findings of [Lewis's] investigation." Thus, there was no separate investigation of her allegations of racism. Once again, however, Ogunsanya had been terminated for legitimate, nondiscriminatory reasons. An investigation might have revealed that some of the people who complained about her were racially prejudiced, or even that they had a plan to get rid of all the African-Americans in the department, but for the reasons already discussed (see part IV, *ante*), it would not have undermined the

---

[18]  In a declaration, Ogunsanya claimed that she also complained to Lavey about people referring to Osiegbu as "Charity's boy." In her deposition, however, she admitted that she did not know that people referred to Osiegbu as "Charity's boy" until January 2009, when Gomez told her. In her reply brief, she concedes that she "did not learn [that] Osiegbu was often referred to as 'Charity's boy' until after she was terminated . . . ."

[19]  Ogunsanya argues that she raised a triable issue of fact with regard to retaliation (Gov. Code, § 12940, subd. (h)), citing her complaint to Lavey. Her retaliation claim, however, much like her discrimination claim, must fail, because Abbott proved that it had legitimate, nonretaliatory reasons for the termination decision. It also fails because it does not appear that any of the decision makers were aware of her complaint to Lavey. (*Haberman v. Cengage Learning, Inc.* (2009) 180 Cal.App.4th 365, 387.)

32

ultimate decision to fire her.  Thus, the failure to investigate did not result in any harassment or discrimination against her.

VI

THE STANDARD FOR AN AWARD OF COSTS AGAINST A FEHA PLAINTIFF

Ogunsanya contends that the trial court erred by awarding costs against her, because her claims were not frivolous, unreasonable, or groundless.

A.      *Additional Factual and Procedural Background*.

Abbott filed a memorandum of costs, seeking $48,369.78.  Ogunsanya responded with a motion to tax costs, arguing (among other things) that under FEHA, costs could not be awarded against a plaintiff unless the plaintiff's claims were frivolous, unreasonable, or groundless.

The trial court ruled:  "I do not believe that there is a requirement that there be a finding that the plaintiff's claim was frivolous."  After taxing certain items, it awarded Abbott $26,311.21 in costs.

B.      *Analysis*.

Ogunsanya argues, as she did in the trial court, that under FEHA, costs cannot be awarded against the plaintiff in the absence of a finding that his or her claims were frivolous, unreasonable, or groundless.

That is not the law.

33

Government Code section 12965, subdivision (b) provides that, in an action under FEHA, "the court, in its discretion, may award to the prevailing party . . . reasonable attorney's fees and costs . . . ."

42 United States Code section 2000e-5(k) similarly provides that, in an action under Title VII, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . as part of the costs . . . ."

In *Christiansburg Garment Co. v. E.E.O.C.* (1978) 434 U.S. 412 , the United States Supreme Court held that, in an action under Title VII, "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless . . . ." (*Id*. at p. 422.)  It explained:  "[T]here are at least two strong equitable considerations counseling an attorney's fee award to a prevailing Title VII plaintiff that are wholly absent in the case of a prevailing Title VII defendant.  [¶] First, . . . the plaintiff is the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'  [Citation.]  Second, when a district court awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law. . . .  '[T]hese policy considerations which support the award of fees to a prevailing plaintiff are not present in the case of a prevailing defendant.'  [Citation.]"  (*Id*. at pp. 418-419.)  It also relied on legislative history indicating "that while Congress wanted to clear the way for suits to be brought under the Act, it also wanted to protect defendants from burdensome litigation having no legal or factual basis." (*Id*. at p. 420.)

*Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383 [Second Dist., Div. Seven] held that under FEHA, an award of attorney fees *and costs* against a plaintiff requires a finding that the action was frivolous, unreasonable, or groundless. (*Cummings*, *supra*, at pp. 1388-1390.) It explained: "The standard a trial court must use in exercising its discretion in awarding fees and costs to a prevailing defendant was set forth in the Supreme Court's decision in *Christiansburg* . . . ." (*Id*. at p. 1387.) It therefore reversed the award of fees and costs (*id*. at pp. 1388, 1391) and remanded with directions to deny fees and costs. (*Id*. at p. 1391.)

*Perez v. County of Santa Clara* (2003) 111 Cal.App.4th 671 [Sixth Dist.] refused to follow *Cummings* with respect to costs. It stated: "[T]he issue in *Christiansburg* was limited to the recovery of *attorney fees*. Costs outside of those fees were not at issue. In *Cummings*, the court did not segregate the two parts of the award in applying *Christiansburg*, but overturned them together. Indeed, the court even represented the *Christiansburg* holding as pertaining to both attorney fees and costs. [Citation.]

"We find this blending of fees and costs to be unnecessary and inappropriate. Several federal courts themselves have refused to apply the *Christiansburg* test for recovery of defense attorney fees to ordinary litigation expenses. [Citations.] 'The rationale for this distinction is clear. Whereas the magnitude and unpredictability of attorney's fees would deter parties with meritorious claims from litigation, the costs of suit in the traditional sense are predictable, and, compared to the costs of attorneys' fees, small.' [Citation.] . . .

35

"By parity of reasoning, we believe that ordinary litigation costs are recoverable by a prevailing FEHA defendant even if the lawsuit was not frivolous, groundless, or unreasonable." (*Perez v. County of Santa Clara*, *supra*, 111 Cal.App.4th at pp. 680-681, fns. omitted.)

Every subsequent case regarding the standard for a costs award against a plaintiff under FEHA has rejected *Cummings* and followed *Perez*. (*Hatai v. Department of Transportation* (2013) 214 Cal.App.4th 1287, 1299 [Second Dist., Div. Three]; *Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 135-136 [First Dist., Div. Two].) In our view, then, it is established law that such an award does not require a finding that the plaintiffs' claims were frivolous, unreasonable, or groundless. There is no genuine split of authority, because the parties in *Cummings* apparently never raised the issue of the standard for an award of costs. "'"It is axiomatic that cases are not authority for propositions not considered."' [Citation.]" (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626.)

We conclude that the trial court properly awarded costs against Ogunsanya.

## VII

## DISPOSITION

The judgment is affirmed. In the interests of justice (Cal. Rules of Court, rule 8.278(a)(5)), we award Ogunsanya costs on appeal against Abbott.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI

J.

We concur:

RAMIREZ

P. J.

KING

J.

37

**ABBOTT**



Susan Slane,
Quality Director
{CT2/60, 6/1226}

Steve Wirkus,
Quality Director
{RT6./1226}

Barbara Nollau
Supplier & Alliances
Quality Director
{CT1/64}

Charity Ogunsanya
Manager,
Microbiology Dept.

Koye Obadina
Group Leader
{CT2/292}

Emmy Osiegbu
Group Leader
{CT2/292}

Jacquie Lee
Group Leader
{CT2/323, 6/1212}

Tim Farmer

Matt Stetson

Danny Sanchez

Zaina Bawa

Sara Plumley

Kerry Hart

Nick Gomez

Donna Horner

**LONZA**

Jennifer Harrington
Sales Representative,
Lonza

Attachment A