Filed 6/13/23  Slagel v. Liberty Mutual Insurance Company CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JOY SLAGEL,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY et al.,<br><br>Defendants and Respondents. | B310132, B312788, B316017<br><br>(Los Angeles County<br>Super. Ct. No. BC648246) |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Reversed in part and affirmed in part.

Shegerian & Associates, Carney R. Shegerian and Anthony Nguyen for Plaintiff and Appellant.

Jackson Lewis, Yvonne Arvanitis Fossati, Thomas G. Mackey, Dorothy L. Black, and Dylan B. Carp for Defendants and Respondents.

_____

In this wrongful termination action, employee Joy Slagel appeals from a judgment and post-judgment orders entered after the trial court granted the motions by her employer, Liberty Mutual Insurance Company (Liberty), and two supervisors, for summary judgment. We reverse in part and affirm in part.

## BACKGROUND

### I. Employment

#### A. Liberty's Supervisory Structure

Liberty provides insurance services, including Worker's Compensation insurance. From 2012, Liberty employed Ariam Alemseghed to oversee its Glendale Claims Department as a Regional Claims Manager. From 2013, Liberty employed Leann Lo in its Glendale department as a Claims Manager.

In 2012, Ariam Alemseghed was promoted to Regional Claims Manager, overseeing Liberty's Glendale claims department.

Alemseghed lacked the authority to terminate an employee for misconduct, and could terminate someone for underperformance only with internal approvals.

#### B. Slagel's Duties and Complaints

Liberty employed Slagel from 1985 to June 30, 2016, most recently as Senior Case Manager in its Glendale claims department. For 30 years, she received consistently positive reviews from supervisors, colleagues and clients.

From 2012 to April 24, 2015, Slagel reported directly to Team Manager Craig Ballard.

From April 2015 until her termination, Slagel reported directly to Team Manager Melanie Krikorian, who in turn reported to Leann Lo, who reported to Alemseghed.

2

Liberty's Employee Handbook and Code of Business Ethics and Conduct, of which Slagel was aware, prohibited employees from making untruthful statements in company communications and provided that a violation of the policy could lead to termination.

In February 2015, Slagel went on disability leave due to stress and anxiety. After returning in March 2015, Alemseghed instructed Ballard, Slagel's immediate supervisor, to rate Slagel as "needs improvement" on her performance assessment. When Slagel asked Ballard why she received this rating, he told her he had not wanted to give it but Alemseghed instructed him to do so. When Slagel complained to Alemseghed about the rating, Alemseghed stated that because of her "tenure," Slagel would be held to "higher expectations."

On March 4, 2015, Slagel wrote to Glenn Shapiro, Liberty's Vice President/Chief Claim Officer, complaining that Alemseghed mistreated her and several other long-term employees "in a manner that lacked dignity and respect," and she feared retaliation because Alemseghed had a close relationship with Virginia Bennett, Liberty's Human Resources Generalist. Slagel received no response.

In June 2015, Slagel told Human Resources (HR) Manager Michael Polk that 15 people had left in the last 12 months, and Alemseghed wanted long-term employees to leave so she could hire recent college graduates. Nothing was done.

In November 2015, Slagel received a Customer Service Award for her handling of claims for one of Liberty's accounts. Alemseghed told her, "You just got lucky, it will never happen again."

In January 2016, Lo became Slagel's Claims Manager. Shortly thereafter, Lo accused Slagel of speaking negatively about Liberty, and said, "I am warning you!"

Lo and Alemseghed thereafter inundated Slagel with work and shunned and ostracized her.

## C. Disney's Complaint Against Slagel Regarding a Social Media Report

In 2014, Slagel was assigned Liberty's Disney account.

Part of her duties included attending litigation review meetings (sometimes called "claims review" meetings) between Disney, Disney's legal counsel, and Liberty claims managers to discuss workers' compensation claims pending against Disney.

If requested to do so, Slagel was required to conduct a social media "check" on a workers' compensation claimant. A social media check consists of searching for whether the claimant has a social media presence and whether there are any red flags, i.e., bases for an articulable suspicion that the claimant was defrauding his or her employer. The check was typically performed by searching multiple social media outlets to see whether the claimant was engaging in activities outside his or her medical restrictions.

A social media check would typically be done either by the claims manager or handling adjustor, but if further investigation was required it would be assigned to a field investigator. If the investigators were too busy, Liberty would retain an outside vendor to pursue further investigation. Once a check has been performed, the investigator would place a note in the claimant's file reporting the findings.

In April 2015, at a claims review meeting that included Slagel, Ballard and Stephanie Conner, who works for Disney

4

(apparently in its risk management department), Conner requested that Ballard perform a social media check on a workers' compensation claimant. Ballard got on his laptop "on the spot" and used his personal subscriptions to Intelius, a public records search service, and Spokeo, a people search Web site, to determine that nothing indicated the claimant was "doing anything outside of her [medical] restrictions." Ballard also looked up the claimant on Facebook and found no " 'articulable suspicion' of possible fraud" such as would justify more formalized surveillance. He verbally reported, "Nothing of interest here," and, "Doesn't look like the person is active," but failed to make a note of his findings in the claimant's file.

Slagel did not know that Ballard failed to note his findings in the claimant's file.

In August 2015, Conner requested a social media check for the same claimant as had been the subject of Ballard's April 2015 search. Slagel reminded Conner that Ballard had performed the social media search in April 2015, and it was negative.

On March 24, 2016, Slagel attended a litigation review meeting at which Conner was present. Conner again requested a social media check on the same claimant, and Slagel again informed her that it had already been conducted by Ballard in April 2015. Slagel told Conner she would get a copy of the report and send it to her.

Thirty minutes after the meeting, Slagel for the first time formally requested a social media report on that claimant, doing so under a Liberty system category called "Medical," which a client such as Disney could not access through Risktrac, Liberty's claims tracking program on its Web site, instead of a category called "Investigation," which the client could access.

The next day, March 25, 2016, Conner emailed Slagel, "Please send me a copy of the social media background check that we discussed at the review yesterday." Slagel replied, "I do remember the Social Media Search previously came back negative but I could not locate the report. I have requested a copy of the report. I will forward you a copy once received."

The second social media check was performed on the claimant and came up negative. On April 8, 2016, Slagel forwarded the report to Conner.

That same day, April 8, 2016, Conner emailed Krikorian, stating, "This is the case we discussed shortly after the lit review. I saw your [note] stating that the social media check had not been completed. I asked [Slagel] during the review and she stated it was completed, but there were no findings. I asked for a copy of the report . . . and received the attached . . . report dated 4/8/16. There are obviously findings on this report. I checked Risktrac and see that the referral was made 3/24/16 (the day of the litigation review). I understand that to do items or activities slip through the cracks, but my concern is that [Slagel] was trying to hide the fact that it was not completed. She continued to tell me that the second copy was requested (we just spoke yesterday), when in fact this was an initial referral with a report completed today. . . . This is concerning because this appears to be an obvious attempt for her to hide information from Risk Mgmt and I hope there aren't other claims with this type of action. This was not a major point or factor in this case, and she could have easily said she forgot and would complete ASAP."

Krikorian forwarded Conner's concerns to Lo, who forwarded them to Virginia Bennett (Liberty's Principal HR Generalist).

Bennett interviewed Slagel by telephone. Slagel told Bennett that Ballard had already conducted Disney's requested social media search during a prior claims review meeting in April 2015 and had advised Conner of the negative results. Slagel suggested that Ballard be contacted to confirm that the April 2015 social media search had been completed, but Bennett refused to contact Ballard and forbade Slagel from doing so.

When asked why she had posted her request for a social media report under the "medical" topic rather than "investigation," Slagel replied, "Because the customer can't see it. I just assumed I should post it under medical because they can't see it. Medical information they cannot see." When asked whether she felt this was medical information, Slagel replied, "Not sure, maybe I should post it under investigation?"

On April 15, 2016, Conner called Krikorian, who memorialized the conversation as follows:

"[Conner] gave Joy several opportunities to come clean about what happened and Joy continued to deceive her on that particular file. She followed up on 3/25 after the lit review asking for the report and Joy continued to say she would get a copy. She called her on 4/7 and verbally asked her and Joy again said she would get the copy. Not once did Joy tell Stephanie that there was no prior [social media] check and that this was the first request.

"[Conner] specifically told me that she informed [a Disney employee] and [she] was pretty upset after hearing that [Slagel] lied about this social media check. Disney wants to set aside 30 minutes after the claims review on 4/19 to discuss these issues and discuss Joy. They want us to disclose some information to them to assist them in making a decision about Joy on the

7

account. [Conner] said they would have to evaluate this internally as well. When I asked [her] if there were other issues she went on to say that Joy is not proactive, that [Conner] has to follow up with her on several claims, that [another Liberty employee] calls [Conner] everyday to discuss claims and their progress but [Slagel] doesn't. The level of customer service provided is not adequate and they feel that [Slagel] is 'skating' by and only doing minimal work on their account.

"[Conner] also said that if [the other Liberty employee] made this same mistake it would be out of character for [her] but knowing that [Slagel] did it, it doesn't surprise them because they already question her integrity.

"At the end of the day, [Conner] questions [Slagel's] integrity on the claims handling and wants to know if she is also covering up on other claims or not being truthful about actions taken or not taken on their files."

On April 15 and 18, 2016, Slagel complained to Bennett and Lo that she was being targeted because she was a 30-year employee whom Alemseghed wanted to replace.

On April 19, 2016, Slagel sought medical care for hypertension, coronary artery disease, hyperlipidemia, and panic attacks related to work-related stress and depression, and subsequently applied for short-term disability leave.

While Slagel was on leave, Bennett analyzed her failure to obtain a social media report for Disney and noted that Slagel thought she was being set up because she was a 30-year employee. Bennett resolved Slagel's complaint with no investigation because he believed she was a "negative influence in the Glendale office."

On June 10, 2016, Bennett emailed a report of her examination, titled "Situation Analysis," to Gabriel Williams, Liberty's Employee Relations Consultant, who could authorize terminating an employee. Bennett recommended that Slagel be terminated.

Williams, who was also an attorney, approved Slagel's termination for cause because she had falsified company records, as she admitted during her telephone interview with Bennett that she placed the Disney request for a social media report under the "medical" category because Disney would be unable to see it.

Lo terminated Slagel on June 30, 2016, the day she returned from leave.

## II. Lawsuit

### A. Complaint

Slagel filed a complaint against Liberty, Alemseghed, and Lo, alleging causes of action for:

(1) age-based discrimination;

(2) age-based harassment;

(3) retaliation in violation of the California Fair Employment and Housing Act (Gov. Code, § 12900, et seq.; FEHA)[1];

(4) discrimination on the basis of taking disability leave;

(5) retaliation for taking disability leave;

(6) failure to provide reasonable accommodation;

(7) failure to engage in the interactive process in violation of FEHA;

---

[1] Undesignated statutory references will be to the Government Code.

(8) breach of express oral contract not to terminate employment without good cause;

(9) breach of implied-in-fact contract not to terminate employment without good cause;

(10) wrongful termination in violation of public policy;

(11) violation of Labor Code section 1102.5; and

(12) intentional infliction of emotional distress (IIED)).[2]

Slagel basically alleged that Alemseghed and Lo, with the assistance of Conner, their protégé, conspired to terminate Slagel due to her age. They did so by inducing Conner to feign confusion over a Disney social media report, then leverage Conner's false complaint to Liberty about Slagel into a violation of company policy.

**B.    Discovery**

1.    *Williams Deposition*

During discovery, Slagel attempted to depose Williams concerning his decision to approve Slagel's termination. During the deposition Williams, an attorney, was unable to understand several basic questions. As a sampling:

"Q:   Is there any company policy against using personal e-mail for Liberty Mutual business?

---

[2] Slagel makes no attempt on appeal to support her 6th, 7th, 8th, 9th, or 11th causes of action, respectively failure to provide reasonable accommodation or to engage in the interactive process in violation of FEHA, breach of express or implied contract, and violation of Labor Code section 1102.5. We will therefore affirm as to them. (*Telish v. State Personnel Board* (2015) 234 Cal.App.4th 1479, 1487, fn. 4.)

"A: Can you be more specific?  I don't understand the question. . . .  I don't think your question is specific enough for me to answer. . . .  I can't answer—I just can't answer that question.  I just don't understand it well enough to answer."

"Q: Do you happen to recall the type of cases that you were deposed for?

"A: I'm not sure what you mean by 'type of case . . . .' "

"Q: Do you happen to recall the nature of that cause of action?

"A: I'm not sure what you mean by 'nature . . . .' "

"Q: Outside of your conversations with counsel, did you speak with anybody about this deposition?

"A: What do you mean by 'speak' with someone?  I'm thinking it has multiple definitions."

"Q: Did you have to undergo any training for the position?

"A: What do you mean by 'have to?' "

"Q: Do you recall whether you used material to conduct that training?

"A: What do you mean by material?"

"Q: Did you conduct that training from memory?

"A: Entirely? . . . Did I conduct any part from memory.  I remember my name, so I mentioned my name. . . ."

Williams claimed attorney client privilege regarding any conversation he had with Bennett, stating that if any such conversation occurred, it "involve[d] counsel."  He testified he did not recall "much, if anything" about Bennett's situation analysis, upon which he depended to approve Slagel's termination, because he had not "reviewed it in a long time."

Williams avoided the entire line of questioning pertaining to Slagel's termination:

11

"Q: In your department, what role does your department play in the hiring and firing of employees?

"[Counsel]: Lacks foundation, assumes facts not in evidence, vague and ambiguous both as to time and overbroad as to scope.

"A: You're talking about the current department I'm in?

"Q: Correct.

"[Counsel]: Not reasonably calculated to lead to the discovery of admissible evidence.

"A: I actually don't know the title of the direct department I am in.

"Q: When you say the department that you're currently in, were you in this same department at the time that Ms. Slagel was terminated?

"A: I don't know the official title of the department I'm directly in. So because of that I can't answer that question.

"Q: Does your department have any role in the hiring of employees?

"[Counsel]: Vague and ambiguous, lacks foundation with regards to the department.

"A: I would need to know what department I'm in to answer that question. What was the question?"

"Q: In the event that you felt that termination was not appropriate, what would then be the result?

"[Counsel]: Objection, incomplete hypothetical, lacks foundation, assumes facts not in evidence, calls for speculation, vague and ambiguous and unintelligible.

"A: If I thought that termination was not appropriate, of what, when, who, where?

"Q: If you felt that Ms. Slagel's termination was not appropriate at the time that it was escalated to you, what then would have occurred?

"[Counsel]: Objection, calls for speculation. Incomplete hypothetical, lacks foundation, assumes facts not in evidence, calls for speculation. I would need to know more about that hypothetical before I could answer your question.

"Q: Just to note, you're unable to answer this question right now, is that correct?

"A: Based upon how you asked it, that is correct."

On January 9, 2019, Slagel moved to compel further responses from Williams, arguing he avoided entire lines of questioning through "patently evasive nonsense." The court denied the motion, finding that "Defendant's counsel asserted proper objections and . . . the deponent gave substantive answers." The court stated, "[t]he fact that deponent asked for clarification and Plaintiff's counsel was forced to repeat questions is not harassing and to be expected with a telephonic, out-of-state deposition."

### 2. *Polk Deposition*

On March 4, 2020, Slagel deposed Liberty's HR Manager, Michael Polk. Polk testified that he interviewed employees, including Alemseghed, following Slagel's discrimination complaint to Shapiro, and took notes of these interviews. However, he was instructed not to answer questions regarding anyone interviewed other than Slagel, and the deposition was suspended because neither his notes nor information related to his interviews were produced.

On May 1, 2020, the trial court granted Slagel's ex parte application to compel Polk's further deposition, but defendants

13

withheld, based on privilege, an email from Polk to Bennett regarding Polk's interviews and failed to produce Polk's complete interview notes. During the subsequent deposition, Polk could not explain why his notes were not produced.

## III.   Summary Judgment

### A.   Arguments and Evidence

Defendants filed motions for summary judgment, arguing no triable existed as to whether they harbored a discriminatory motive for Slagel's discharge.

#### 1.   *Request for a Continuance*

Slagel sought to continue the summary judgment hearing to complete discovery regarding Polk's interviews, including the notes and an interview chart (exhibit 17) he had not produced. The court denied Slagel's request, stating Polk's notes "no longer exist and thus cannot support Plaintiff's opposition to the Motion for Summary Judgment."

Slagel also requested time to depose Latecia Flemming, explaining Flemming would testify about her discussions with Polk in response to an anonymous complaint Slagel had made and a subsequent investigation into the work environment in Liberty's Glendale claims department. Slagel further requested time to depose Dan Karnovsky, who controlled the investigatory reports and notes generated during the investigation into Slagel's anonymous complaint of discrimination and harassment committed by Alemseghed. The court denied these requests.

#### 2.   *Defendants' Evidence*

Defendants argued that Slagel was terminated for misconduct, including falsifying records. It argued that on March 24, 2016, Slagel (1) falsely told Conner at Disney that the social media report Conner requested in August 2015 had been

14

completed by Ballard in April 2015, and (2) made a false entry into Risktrac about her April 2016 request for a social media investigation, attempting to hide from Disney the fact that this was the first time an investigation was requested.

In support of the motions, Bennett testified that she recommended to Williams that Slagel be terminated, but the decision to terminate was Williams.

Williams declared that he approved Slagel's termination because of her "admission during her interview [with Bennett] that she placed the request for a Social Media Report under the 'Medical' category because the client would be unable to see the Request."

Alemseghed and Lo declared they had no authority to terminate an employee for misconduct.

3. *Slagel's Evidence*

In opposition to the motions, Slagel denied trying to deceive Disney, argued the social media check issue was "trivial," and argued that Liberty violated its own policies in terminating her.

In support of the opposition, Slagel declared that Ballard could have cleared up the misunderstanding with Disney, but Bennett refused to contact him.

Ballard declared that Alemseghed became supervisor in 2013, after which many long-term employees, including himself, either resigned or were terminated, including Tony Beliso, a 30-plus-year employee who was in his 50s or 60s, Beronica Herrera, a 15-year employee in her 40s, Helen Adoian, a 15-plus-year employee in her 40s, and adjusters Ana Lopez, Kimberly Gruner, Kathy Garcia, Karine Srapyan, and Regina Ghaussi. Ballard declared Alemseghed made his "work environment very difficult and unbearable."

15

Ballard declared that around 2013 to 2014, Disney asked that Slagel be dedicated exclusively to Disney accounts.

Ballard declared that during the April 2015 claims review meeting, Conner asked whether a "social media check" had been done on one of Disney's workers' compensation claimants. A social media check consisted of searching for whether a claimant had a social media presence and whether there were any red flags, or, articulable suspicions, that the claimant was defrauding the workers' compensation system. For example, he could perform a search by looking across multiple social media outlets to see whether there was anything showing the claimant was physically active, working, or engaging in activities outside of his or her medical restrictions. He would place a note in the claimant's file based on his findings. Ballard declared there were different ways to perform a social media check, but typically they were done either internally by the handling adjustor, or if the check called for further investigation an internal field investigator would be assigned. If Liberty's internal investigators were overwhelmed, Liberty would then look to outside vendors to pursue further investigation.

In response to Conner's query, Ballard "performed a social media check through [his] laptop on the spot, by searching through [his] regular system, Intelius, and Spokeo," applications he used as part of his outside employment. He found nothing leading him to believe the claimant was doing anything outside of her workers' compensation restrictions. Ballard also looked up the claimant on Facebook to see if there was any articulable suspicion of possible fraud that would justify "formalized surveillance," but found nothing. Ballard said aloud during the meeting, in Slagel's and Conner's presence, "something to the

effect of, 'Nothing of interest here' and 'Doesn't look like the person is active.' " Ballard did not recall whether he placed a note to that effect in the claimant's file.

Slagel declared that on April 18, 2016, Lo advised her she would be excluded from a two-day claims review with Disney, and that "Jumana, a less senior employee who notably was in her 30s at the time," would take her place. Slagel declared she "complained to Lo that this is age discrimination, and Liberty Mutual is attempting to use this to get rid of [her, and] . . . Liberty Mutual has been getting rid of people [her] age. However, this complaint was disregarded."

Christina Restrepo, a former Liberty employee, declared that Liberty had a culture of "terminating older employees, or in the alternative, unjustifiably increas[ing] their workload, claim[ing] that other employees complained about them, issu[ing] them baseless warnings in an effort to create a paper trail, and subsequently terminat[ing] them." Liberty would replace older employees with younger, underqualified ones, and demote older employees while promoting younger, underqualified ones.

Slagel presented Williams's deposition testimony, in which he stated he communicated only with Bennett concerning Slagel. He did not recall the content of any discussion with Bennett but testified that in approving Slagel's termination he relied on the situation analysis Bennett authored.

Slagel presented evidence concerning her age and disability, qualifications for the job, the demographics in Liberty's Glendale office, and the timing of her complaints and adverse employment actions. She received "glowing" reviews during her 30-year employment; Alemseghed subjected employees over 40 to unreasonable workloads and looked for mistakes to justify

terminating employees over 40; Alemseghed scolded Slagel in 2013 for performing too well on the Disney account, exclaiming, "You set the bar too high, and now we have to jump through hoops because of you!"; Slagel complained to Liberty that Alemseghed continued to treat her and several other long-term employees in a manner that lacked dignity and respect"; Slagel reported to Liberty that Alemseghed "rarely gives older employees 'kudos,' while often giving them to younger employees," and gives "swift and severe reprimands to older employees"; Lo falsely accused Slagel of speaking negatively about Liberty; and Slagel complained to Bennett that she felt Lo and Alemseghed were overreacting to the Social Media Report because "she is a 30-year employee," and Slagel believed she was being "set up."

Slagel also presented the situation analysis that Bennett sent to Williams. Bennett emailed the situation analysis to Williams at 5:19 p.m. on June 10, 2016. The situation analysis noted Slagel's age, the fact that she was "currently on leave of absence," and the fact that Slagel "believes the company is setting her up because she is a 30-year employee." Bennett stated in the email, "we do not plan to implement the termination until the employee return[s] to work," and asked Williams to "[p]lease advise if you have any questions or need any additional information." Nowhere in the email or analysis did Bennett expressly request permission to terminate Slagel. Williams replied to Bennett half an hour later, at 5:51 p.m., "Termination for cause approved."

Slagel argued that Bennett and Williams were not the sole decisionmakers in the decision to terminate her employment because Bennett relied on her discussions with Lo and

18

Alemseghed when reporting to Williams, and Williams relied exclusively on Bennett's situation analysis. Slagel argued that Alemseghed and Lo's animus thus contaminated Williams's decision to terminate her.

### 4. *Ruling and Judgment*

The trial court found that Slagel submitted evidence of a discriminatory motive on the part of Alemseghed, but no triable issue existed as to whether Liberty's reason for terminating Slagel was pretextual because the evidence showed that she failed to order a requested social media report, told Disney that it had been ordered when it had not, and attempted to conceal her error by filing a newly ordered report under a "Medical" rather than "Investigation" category.

"More importantly," the court found, Slagel "simply has not submitted evidence to show how Alemseghed's age bias caused her termination when Alemseghed was not responsible for her termination, and when the proffered reason for Plaintiff's termination, i.e., the social media report incident, actually did occur."

The court thus found it to be undisputed that Bennett and Williams, as opposed to Alemseghed, were responsible for Slagel's termination, and found it "crucial" that Slagel submitted no evidence to suggest Bennett or Williams possessed a discriminatory motive. The court found that Slagel's claim that Bennett participated in Alemseghed's and Lo's "plan to rid themselves of [her was] entirely unsupported speculation," insufficient to raise a triable issue.

The court acknowledged Slagel's argument that the Disney report incident was "trivial," but reasoned that Liberty's burden

was not to show that its decision to terminate Slagel was wise, only that it was nondiscriminatory.

Accordingly, the court granted summary judgment in defendants' favor and entered judgment. It awarded Liberty and Alemseghed jointly $26,917.61 in costs as prevailing parties, allocated to Slagel's non-FEHA claims.

## IV. Lo's Sanctions Motion

On June 12, 2020, Lo sought sanctions pursuant to Code of Civil Procedure section 128.7 against Slagel and her counsel on the ground that Slagel's allegations against Lo lacked factual support. The court found that the only conduct alleged against Lo constituted either personnel management actions or conduct that cannot reasonably be said to show harassment. The court reasoned that Slagel's allegations that Lo's conduct was motivated by Slagel's age were unsupported by any evidence, and Slagel attributed to Lo wrongdoing that was allegedly committed by Alemseghed.

The court awarded Lo $70,058.15 in attorney's fees and $15,418.96 in costs.

## DISCUSSION

Slagel contends the court erred in denying her motion to compel the further deposition of Williams, in denying her motion for a continuance, in finding no triable issue as to whether Liberty's justification for terminating her was pretextual, and in finding her allegations against Lo were in bad faith.

## I. Summary Judgment

In Slagel's surviving causes of action—for age-based discrimination and harassment, discrimination and harassment on the basis of disability, wrongful termination, and IIED—she alleges she was terminated due to her age, disability, and

20

complaints about age-based discrimination. Liberty does not dispute Slagel's membership in protected categories, nor that she made complaints about age-based discrimination and was thereafter terminated. The trial court granted summary judgment on the sole ground that no triable issue exists as to whether Liberty's justification for terminating Slagel was pretextual.

Slagel contends this was error. We agree.

## A. General Legal Principles Regarding Discrimination Claims and Summary Judgment

Both federal and state law prohibit employers from discriminating against employees on the basis of age or disability. (§§ 12940, subd. (a) & 12941; 42 U.S.C. § 2000e et seq.; 29 U.S.C. § 621 et seq.) "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).)

An employee alleging age or disability discrimination or retaliation must be over 40 years old and/or suffer from a disability, and must "ultimately prove that [an] adverse employment action taken was based on his or her age" or disability and/or her complaints about her treatment. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1002 (*Hersant*); accord, *Guz, supra*, 24 Cal.4th at pp. 354-355.) "Since direct evidence of such motivation is seldom available, the courts use a system of shifting burdens as an aid to the presentation and resolution of age discrimination cases." (*Hersant*, at p. 1002.) Specifically, "California has adopted the three-stage . . . [¶] . . . *McDonnell Douglas* [*Corp. v. Green* (1973) 411 U.S. 792] test," which "reflects the principle that direct evidence of intentional

21

discrimination is rare, and that such claims must usually be proved circumstantially. . . . [B]y successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz*, at p. 354.)

At trial, this burden-shifting system requires the employee first establish a prima facie case of age or disability discrimination or retaliation. If the employee does so, the employer is required to offer a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action. "If it does not, then the employee prevails. [Citations.] [¶] Given the varying nature of the problem, it is impossible to make an exact, all-inclusive statement of the elements of a prima facie age discrimination case applicable in all situations. [Citations.] The general requirement is that the employee offer circumstantial evidence such that a reasonable inference of age discrimination arises. The requirement is not an onerous one. [Citation.] [¶] . . . [¶] When the employee has made this showing, the burden shifts to the employer to go forward with evidence that the adverse action was based on considerations other than age discrimination. When the employer offers evidence justifying the adverse action on a basis other than age, the burden shifts back to the employee to meet his ultimate obligation of proving that the reason for the adverse action was age discrimination. This ultimate issue is decided on all the evidence." (*Hersant, supra,* 57 Cal.App.4th at pp. 1002-1003.)

"The *McDonnell Douglas* framework is modified in the summary judgment context." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861.) On a summary judgment motion "[i]n an employment discrimination case, . . . [t]he

'employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, 32; see Code Civ. Proc., § 437c, subds. (c) & (p)(2).)

If the defendant meets its burden, the burden then shifts to the plaintiff to produce substantial evidence that the employer's showing was untrue or pretextual by raising at least an inference of discrimination or retaliation. (*Hersant*, *supra*, 57 Cal.App.4th at pp. 1004-1005.)

"Pretext may . . . be inferred from the timing of the company's termination decision, by the identity of the person making the decision, and by the terminated employee's job performance before termination." (*Sada v. Robert F. Kennedy Med. Center* (1997) 56 Cal.App.4th 138, 156.) "[E]vidence that the employer's claimed reason is *false*—such as that it conflicts with other evidence, or appears to have been contrived after the fact—will tend to suggest that the employer seeks to conceal the real reason for its actions, and this in turn may support an inference that the real reason was unlawful." (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 715.)

To show pretext, the employee may not "simply deny the credibility of the employer's witnesses or . . . speculate as to [its] motive." (*Serri v. Santa Clara University*, *supra*, 226 Cal.App.4th at p. 862.) Nor is it enough to show that the employer's reasons were unsound, wrong, or mistaken. (*Hersant*, *supra*, 57 Cal.App.4th at p. 1005.) Rather, the employee " 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for" ' " the asserted reasons. (*Ibid*.) If, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer violated public policy, the employer is entitled to summary judgment. (See *Guz, supra*, 24 Cal.4th at p. 361.)

"In short, by applying *McDonnell Douglas's* shifting burdens of production in the context of a motion for summary judgment, 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " (*Caldwell v. Paramount Unified School Dist*. (1995) 41 Cal.App.4th 189, 203 (*Caldwell*).)

Whether such an issue exists presents a question of law for the court, which we review de novo. (*Caldwell, supra*, 41 Cal.App.4th at p. 201.) In so doing, we view the evidence in the light most favorable to the employee as the party opposing the motion. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.)

Claims, theories, subjective conjecture, and speculation are insufficient to avoid summary judgment. (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 11 [an opposition to summary judgment is insufficient when it is essentially conclusionary, argumentative or based on conjecture and speculation].)

An analogous procedure applies to a claim for wrongful discharge. (See *Swanson v. Morongo Unified School Dist*. (2014) 232 Cal.App.4th 954, 966.)

**B.    Application**

Here, Liberty offered evidence of a legitimate, non-retaliatory reason for discharging Slagel: She violated company policy by lying to Disney and by falsifying company records by filing a social media request under "medical" rather than "investigation" in order to conceal her misrepresentation. Liberty supported its showing with records of communications from Conner, Disney's representative, in which she complained about Slagel's failure to produce a social media report on a workers' compensation claimant.

1.    *Triable Issues Exist as to Pretext*

This evidence shifted the burden to Slagel to establish a triable issue of material fact as to whether Liberty's proffered rationale for terminating her was pretextual.

She did so. Slagel and Ballard testified and declared that the issue with Disney concerning its request for a social media investigation was a misunderstanding. Ballard conducted a social media check on Disney's workers' compensation claimant in April 2015, in Conner's presence. When Conner asked for a report of the investigation in August 2015 and April 2016, Slagel did not know that Ballard had failed to make a report of his April 2015 social media check. She said she would obtain "the report," but instead of doing so commissioned another investigation, logging this new request under the topic "medical" in Liberty's records rather than "investigation" for the admitted purpose of preventing Disney from learning about it. Slagel stated in her interview with Bennett that she did not know whether logging the request under "medical" was improper.

This evidence supported two conflicting inferences about two different issues.

25

First, it supported Liberty's inference that Slagel lied to Disney and tried to conceal the lie by falsifying Liberty records.

However, the evidence also supported Slagel's inference that this was a misunderstanding based on Slagel's thinking that Conner simply forgot about Ballard's investigation.

Although Liberty argues at length about the difference between a social media "check" and a social media "report," reasoning that Slagel could not mistake Conner's request for the latter as having been satisfied by Ballard's performance of the former, in truth the parties throughout this case have used both terms interchangeably. For example, although Ballard declared he conducted a social media "check," he also admits he cannot remember whether he turned that check into a "report" by making a note of it in the claimant's file.

Liberty argues that a "report" is a "concrete piece of paper" as opposed to an informal "check," but that characterization appears nowhere except Slagel's own deposition testimony, who did not think the difference was important, and was contradicted by Ballard's declaration that a "report" consisted of an online annotation in a client's file. Liberty argues that a social media "report" is the result of an investigation conducted by a third party, but Ballard declared that social media investigations were conducted by third parties only when informal checks raised "red flags," and even then only when internal investigators were too busy to conduct the investigation.

In sum, a trier of fact could reasonably conclude that Slagel believed that Disney's August 2015 and April 2016 requests for a social media investigation had already been fulfilled, and ordered a second investigation only out of an abundance of caution to keep the client happy. The trier of fact could also reasonably

26

conclude that Slagel did not know it would be improper to conceal the second request from Disney until such time as it was reported, which it inevitably would be.

The evidence supported two conflicting inferences about a second issue as well: How important was this dispute to Liberty?

On the one hand, a trier of fact could reasonably conclude Liberty felt this was important enough to fire Slagel because Conner complained about Slagel's honesty.

On the other hand, Slagel had been an exemplary employee for several decades. "Pretext may . . . be inferred . . . [from] the terminated employee's job performance before termination." (*Flait v. North American Watch Corporation* (1992) 3 Cal.App.4th 467, 479; *Colarossi v. Coty US Inc.*, (2002) 97 Cal.App.4th 1142, 1153.) Firing a highly rated employee for a minor offense is evidence of pretext. (*Flait*, at p. 479; *Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 401.)

And the Disney incident involved only one client's request for only one social media investigation, which was performed twice, with negative results both times. Pretext may be shown where the severity of an employer's punishment does not fit the putative issue. (*Stalter v. Wal-Mart Stores, Inc.* (7th Cir. 1999) 195 F.3d 285, 290 ["More compelling is the severity of the punishment in relation to the alleged offense. . . . This strikes us as swatting a fly with a sledge hammer. That Wal-Mart felt compelled to terminate Stalter for this offense does not pass the straight-face test"].)

In addition, Slagel told Bennett that the social media check/report misunderstanding could be cleared up if only Bennett would call Ballard. Ballard supported this representation in his declaration, in which he stated he

27

conducted a social media check on Disney's claimant but failed to make a report of it. An employer's failure to adequately investigate matters relating to its employee is evidence of pretext. (*Mendoza v. West. Med. Cent. Santa Ana* (2014) 222 Cal.App.4th 1334, 1344 [lack of a rigorous investigation is evidence suggesting that defendants did not value discovery of the truth so much as a way to clean up an uncovered mess]; *Silva v. Lucky Stores, Inc.* (1998) 65 Cal.App.4th 256, 262-263 [" 'the question critical to defendants' liability is . . . whether at the time the decision to terminate his employment . . . defendants, acting in good faith and following an investigation that was appropriate under the circumstances, had reasonable grounds for believing plaintiff had done so' "]; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 121.) "[F]ailure to interview witnesses for potentially exculpatory information evidences pretext." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 280.)

> 2. *Triable Issues Exist as to Liberty's Discriminatory Motive*

The trial court found that Slagel "submitted evidence to suggest a discriminatory motive by Alemseghed."

However, the court found no triable issue as to whether Alemseghed's age bias caused Slagel's termination because "Alemseghed was not responsible for her termination." On the contrary, the court found, Bennett and Williams were responsible for Slagel's termination, and no evidence suggested they possessed a discriminatory motive.

We reject this conclusion for three reasons.

First, as discussed above, substantial evidence suggested that Bennett directly participated in Alemseghed's plan to rid Liberty of Slagel on the basis of her age: Slagel was an

28

exemplary employee; her offense against Disney was arguably minor and immaterial; the offense was a misunderstanding that Bennett could have cleared up with a reasonable and appropriate investigation, including an interview of Ballard, but failed to do so; and the punishment Bennett recommended was overly severe in relation to the offense.

Second, although the court found that Williams was responsible for Slagel's termination, its earlier discovery ruling prevented Slagel from fully investigating whether this was true.

Williams, an attorney, testified he did not recall "much, if anything" about Bennett's situation analysis, upon which he purportedly depended to approve Slagel's termination, because he had not "reviewed it in a long time." Assisted by harassing objections from Liberty's counsel, Williams professed not to know what department he was in, whether it was the same department he was in when Slagel was terminated, or what would have happened had he failed to approve the termination. (The deposition transcript is, frankly, painful to read.)

Slagel moved to compel further responses, arguing Williams had avoided entire lines of questioning through "patently evasive nonsense," but the court found that Liberty's "counsel asserted proper objections" and "Williams gave substantive answers" in a manner "to be expected with a telephonic, out-of-state deposition."

We disagree. Liberty's objections were obstructionist, Williams's answers obfuscatory, and the conduct of the deposition far below the standard to be expected, telephonic or not.

More importantly for our purposes, Liberty's discovery abuse prevented Slagel from potentially obtaining the very evidence upon which it now relies. The court found that no

29

triable issue existed as to Liberty's discriminatory motive because no evidence suggested anyone but Williams, who did not know Slagel, made the ultimate decision to fire her. But even Williams himself purported not to know his role in the termination. Liberty cannot hide Williams's role during discovery then rely on it on summary judgment.

Finally, even if neither Bennett nor Williams harbored discriminatory animus toward Slagel, a triable issue exists as to whether Alemseghed's animus may be attributed to them.

" ' "[A]n individual employment decision should not be treated as a . . . [']watertight compartment, with discriminatory statements in the course of one decision somehow sealed off from . . . every other decision. . . .['] " ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 74.) "Thus, showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.)

An employer is "responsible where discriminatory or retaliatory actions by supervisory personnel bring about adverse employment actions through the instrumentality or conduit of other corporate actors who may be entirely innocent of discriminatory or retaliatory animus." (*Reeves v. Safeway Stores*, *supra*, 121 Cal.App.4th at p. 116.) "To establish an entitlement to judgment as a matter of law, it is not enough to show that one actor acted for lawful reasons when that actor may be found to have operated as a mere instrumentality or conduit for others who acted out of discriminatory or retaliatory animus, and whose actions were a but-for cause of the challenged employment action.

30

If a supervisor makes another his tool for carrying out a discriminatory action, the original actor's purpose will be imputed to the tool, or through the tool to their common employer." (*Id*. at p. 113.)

Judge Posner explained this concept in *Shager v. Upjohn Co., supra*, 913 F.2d 398. There, the district court granted the employer's motion for summary judgment, in part because the plaintiff had been discharged by decision of a "Career Path Committee," whose members did not appear to have acted with discriminatory animus. In reversing, Judge Posner wrote that the committee's decision to fire the plaintiff did not necessarily insulate the employer from the age-related animus exhibited by the plaintiff's supervisor Lehnst; rather the decision "was tainted by Lehnst's prejudice" because he "not only set up Shager to fail by assigning him an unpromising territory but influenced the committee's deliberations by portraying Shager's performance to the committee in the worst possible light." (*Id*. at p. 405.)

In language with distinct parallels to the facts a jury might find here, Judge Posner explained further: "Lehnst's influence may well have been decisive. The committee's deliberations . . . were brief, perhaps perfunctory; no member who was deposed could remember having considered the issue. A committee of this sort, even if it is not just a liability shield invented by lawyers, is apt to defer to the judgment of the man on the spot. Lehnst was the district manager; he presented plausible evidence that one of his sales representatives should be discharged; the committee was not conversant with the possible age animus that may have motivated Lehnst's recommendation. If it acted as the conduit of Lehnst's prejudice—his cat's-paw—the innocence of its members would not spare the company from liability. For it would then be

31

a case where Lehnst, acting within (even if at the same time abusing) his authority as district manager to evaluate and make recommendations concerning his subordinates, had procured Shager's discharge because of his age. Lehnst would have violated the statute, and his violation would be imputed to [the employer]. The committee would be out of the picture." (*Shager v. Upjohn Co.*, *supra*, 913 F.2d at p. 405; see *id*. at p. 406 [triable issue existed as to whether the committee was a "mere rubber stamp," or "made an independent decision"].)

Here, triable issues exist as to whether Williams's decision to approve Slagel's termination was tainted by Alemseghed's bias. Alemseghed influenced Bennett's and Williams's deliberations by portraying Slagel's performance in the worst possible light. This influence may well have been decisive. Williams's deliberations were brief, perhaps perfunctory, taking only about half an hour. Williams testified in deposition that he could not remember having considered the issue. Having no personal knowledge of the facts, Williams, who was not conversant with the possible age animus that may have motivated Alemseghed's recommendations (as filtered through Bennett), was apt to defer to Bennett's and Alemseghed's judgment. If Williams acted as the conduit of Alemseghed's bias, his innocence would not spare Liberty from liability for Alemseghed's procuring Slagel's discharge because of her age.

3.      *Conclusion*

Admittedly, a trier of fact could reasonably draw inferences in Liberty's favor from all this evidence. However, it could also draw reasonable inferences in Slagel's favor. On summary judgment, inferences must be drawn in favor of the opposing party.

32

Here, the trial court should have but failed to draw several inferences in Slagel's favor. Therefore, summary judgment was improper.

### C. Harassment and IIED

Discrimination in the workplace can constitute "extreme and outrageous" conduct for purposes of IIED. (*Renteria v. County of Orange* (1978) 82 Cal.App.3d 833, 834.) "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is ' "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," ' the law is violated." (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 409; *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 23.)

The trial court acknowledged that Slagel raised a triable issue regarding "a discriminatory motive by Alemseghed," but found that she "failed to disclose a triable issue of fact as to whether she was exposed to discriminatory, retaliatory, or harassing conduct."

Given the discussion above, triable issues existed as to Liberty's justification for terminating Slagel. It follows that triable issues exist as to whether Slagel was subjected to discriminatory or retaliatory harassment. Therefore, summary judgment was improper as to her claims for harassment and IIED.

## II. Lo's Sanctions Motion

Slagel alleges that Lo abused her power as supervisor by subjecting Slagel and other employees over the age of 40 to heavier workloads and harsher performance-based standards than younger employees, and to more stringent repercussions for

adverse performance than those to which counterparts under age 40 were subjected.

Lo moved for sanctions under subdivision (b)(3) of Code of Civil Procedure section 128.7 (a party must abandon unsupported claims). The trial court found Slagel's action against Lo lacked support because the only conduct alleged against Lo constituted either personnel management actions or conduct that could not reasonably be said to show harassment, such as that Lo joked and talked with other employees on Slagel's team more than with her, "micromanaged her," and once called her into her office to ask if she was talking "bad about the company." The court also reasoned that Slagel's allegations that Lo was motivated by Slagel's age, and that Lo singled out employees over the age of 40, were speculative and unsupported by any evidence. It therefore granted Lo's motion.

Slagel argues this was error. We agree.

An attorney who presents a pleading, motion or similar paper to the court makes an implied certification to its legal and factual merit. (Code Civ. Proc., § 128.7, subd. (b).) Specifically, the attorney certifies that the "allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." (*Id*. at subd. (b)(3).) If the court determines, after notice and a reasonable chance to respond, that the attorney improperly certified the document, it may impose an appropriate sanction upon the attorney or party responsible for the violation. (*Id*. at subd. (c).) A court may impose these sanctions if it concludes the pleading was indisputably without factual merit. (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 440.) To obtain

sanctions, the moving party must show that the party's conduct in asserting the claim was objectively unreasonable, meaning "any reasonable attorney would agree that [the claim] is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650; *Peake*, at p. 444.)

We review a trial court's decision to award attorney's fees and costs under Code of Civil Procedure section 128.7 for an abuse of discretion. (*Peake v. Underwood, supra,* 227 Cal.App.4th at p. 441.) We infer all findings necessary to support the order, "presume the trial court's order is correct[,] and do not substitute our judgment for that of the trial court." (*Ibid*.)

The trial court made preliminary and final findings about these allegations, set forth in three paragraphs in the minute order comprising its statement of decision.

The first two paragraphs concern the court's preliminary findings, the first setting forth its findings as to the legal sufficiency of Slagel's claims against Lo and the second setting forth its evidentiary findings.

With respect to the claims' *legal* sufficiency, the court preliminarily found that Slagel's decision to pursue a claim against Lo was "objectively unreasonable." This was so, the court explained, because "[b]eing more jovial and conversational with certain employees over others falls very short of the severe and pervasive conduct needed to state a claim for harassment." "Similarly," the court found, evidence of being 'micromanaged' or questioned if you were maligning the company to others squarely falls into managerial conduct."

Regarding the *evidentiary* sufficiency of Slagel's claims, the court found that Slagel admitted in deposition that she had no basis for her opinion that Lo micromanaged her due to her age,

35

"because she had no evidence of how Defendant Lo was managing other claims adjusters." The court found that Slagel's allegation that Lo disfavored older employees "was purely speculative, and no basis for this belief was forthcoming. Subjective opinion, unsupported, is not a basis for reasonable belief." "Put simply," the court found, "there is no reasonable way Plaintiff or counsel could have believed there was a tenable claim against Defendant Lo in light of the available evidence," nor that "the evidence available could show malicious, oppressive, or fraudulent conduct by Defendant Lo, or conduct '. . . so extreme as to exceed all bounds of that usually tolerated by a civilized community.' "

The court followed these preliminary findings with a third paragraph, setting forth its final finding:

"Accordingly, the Court finds that Defendant Lo has submitted sufficient evidence to show that Plaintiff violated CCP section 128.7(b) by pursuing a claim against Defendant Lo. Specifically, Plaintiff failed to meet the substantive requirement that the allegations and other factual contentions argued 'have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery,' " citing subdivision (b)(3) of section 128.7 of the Code of Civil Procedure.

By using the words "accordingly" and "specifically" in its final finding, the trial court evinced its intent to summarize the findings set forth in the first two paragraphs of the order. However, the summary concerns only the evidentiary sufficiency of Slagel's claims, not their legal sufficiency.

We therefore conclude that the court arguably found only that Slagel's claims lacked evidentiary support, not that they

36

would have been legally insufficient even if supported by evidence.

To avoid sanctions under subdivision (b)(3) of Code of Civil Procedure section 128.7, " 'the issue is not merely whether the party would prevail on the underlying factual or legal argument,' but rather whether any reasonable attorney would agree that the claim is totally and completely without merit." (*Kumar v. Ramsey* (2021) 71 Cal.App.5th 1110, 1126.) Hence, the evidentiary burden to escape sanctions under section 128.7 is light. (*Kumar*, at p. 1126.) Slagel "must make a sufficient evidentiary showing to demonstrate that [s]he made a reasonable inquiry into the facts and entertained a good faith belief in the merits of the claim." (*Ibid.*) She need not amass even enough evidence to create a triable issue of fact as would be required if defendants had brought a motion for summary judgment, or allege a valid cause of action, as required to overcome a demurrer. (*Ibid.*)

As noted, the court found that Slagel had no evidence that Lo disfavored older employees or micromanaged her due to her age, "because she had no evidence of how Defendant Lo was managing other claims adjusters."

But Slagel also alleged that after Lo became her direct supervisor, she subjected Slagel to unfair criticism and threatened her. Slagel complained of discrimination to Lo, but Lo did nothing to address her concerns. Instead, Lo participated in a sham investigation despite learning of exculpatory evidence from Slagel, resulting in Slagel's termination. Slagel alleged that Lo's conduct rose to the level of discrimination and harassment prohibited by FEHA.

37

We will assume for the purposes of argument that the trial court's finding is *not* wholly contained in the summary paragraph setting forth its evidentiary findings, but also includes its legal findings—that Lo's "[b]eing more jovial and conversational with certain employees over others" fell short of harassment, and her micromanagement and hostile questioning fells within legally acceptable managerial conduct.

We will further assume for the purposes of argument that the trial court's evidentiary finding was correct—that Slagel had no evidence that Lo disfavored older employees or micromanaged her due to her age.

These two findings would still not answer Slagel's allegations that Lo disregarded evidence that would have exonerated Slagel, and participated in a sham investigation in order to see her fired due to her age.

These allegations were supported by Slagel's declaration that Lo disregarded her complaint that Liberty was discriminating against her due to her age, trying "to get rid of" her, and "getting rid of people [her] age." They were also supported by Bennett's report, which stated that Lo participated in Bennett's investigation, specifically in the interview during which Slagel told Bennett the claim's report matter could be cleared up if they would only consult Ballard, which Bennett refused to do. The trial court made no findings as to either the legal sufficiency of these allegations or their evidentiary support.

Because the trial court found only that a subset of Slagel's allegations lacked legal and evidentiary support, and because some of her allegations against Lo actually did have evidentiary support, sanctions were improper.

38

### III. Discovery Issues, Requests for a Continuance, and Costs

Slagel argues that the trial court abused its discretion in denying her motion to compel the further deposition of Williams, which she needed in order to support her opposition to summary judgment, and in denying a continuance to seek other discovery. She also argues the court erred in awarding defendants costs.

Given the above discussion, and our partial reversal of summary judgment, these issues are moot.

## DISPOSITION

The judgment is reversed as to Slagel's first through fifth and tenth and twelfth cause of action. The costs and sanctions awards are vacated. The judgment is otherwise affirmed. Each party is to bear its own costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

39